# 22-832

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
### FOR THE
# 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱
◆▬◆

**IRAQ TELECOM LIMITED,**

*Petitioner-Appellee*,

**v.**

**IBL BANK S.A.L,**

*Respondent-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York, No. 21-cv-10940 (DLC)

## BRIEF OF APPELLANT IBL BANK S.A.L.

Gassan A. Baloul
Mitchell R. Berger
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Counsel for Appellant IBL Bank*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Respondent-Appellant IBL Bank S.A.L. hereby certifies the following: IBL Bank S.A.L. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated:  July 27, 2022

*Gassan A. Baloul*
Gassan A. Baloul

*Counsel for Appellant IBL Bank S.A.L.*

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS......................................................................... ii

PRELIMINARY STATEMENT ............................................................... 1

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................4

STATEMENT OF THE CASE....................................................................4

I.    Iraq Telecom Initiates Arbitration to Resolve a Dispute with Its Former Business Partner.......................................................................5

II.   The Arbitral Tribunal Rejects Iraq Telecom's Request for Damages and Declaratory Relief, and Grants Only a Costs Award.............................7

III.  The Parties Dispute the Validity of the Arbitration Award in the Lebanese Courts.................................................................................10

IV.  Iraq Telecom Files an *Ex Parte* Motion Seeking Enforcement of the Award and Attachment of IBL's U.S. Correspondent Accounts in Aid of a Second Arbitration.................................................................12

V.   The District Court Refuses to Adjourn Enforcement of the Costs Award Pending Resolution of Annulment Proceedings in Lebanon............14

SUMMARY OF ARGUMENT .............................................................16

STANDARD OF REVIEW ..................................................................20

ARGUMENT ................................................................................21

I.    The District Court Abused Its Discretion in Declining to Stay Enforcement Pending Resolution of Ongoing Annulment Proceedings in Lebanon. ................................................................................21

    A.  Article VI of the New York Convention Grants District Courts Discretion to Stay Enforcement Proceedings Pending Challenges to an Award in the Primary Jurisdiction. .......................................23

    B.  The District Court Failed to Properly Apply the *Europcar* Factors in Denying IBL's Request to Stay Enforcement.........................................27

1.     The District Court Misinterpreted the First Factor, Which Favors Granting a Stay to Avoid Protracted and Expensive Parallel Litigation. ...............................................................................28

2.     The District Court Misapplied the Second Factor, Because the Annulment Action Is Proceeding in Due Course in Lebanon............34

3.     The District Court Improperly Discounted the Third Factor, Which Favors a Stay Because the Award Will Receive Greater Scrutiny in Lebanon. ...........................................................................36

4.     The District Court Clearly Erred in Applying the Fourth Factor, Because IBL Filed the Annulment Action in Lebanon Before Receiving Notice of IT's U.S. Action.................................................40

5.     The District Court Clearly Erred in Applying the Fifth Factor, Because the U.S. Attachment Order, the Lebanese Attachment Order, and IBL's Supersedeas Bond All Provide IT with Sufficient Security. ............................................................................44

6.     The District Court's Failure to Properly Consider International Comity Concerns Weighs Heavily in Favor of Staying Enforcement. ......................................................................................48

CONCLUSION .......................................................................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*,
No. 04 C 7731, 2005 U.S. Dist. LEXIS 7479 (N.D. Ill. Apr. 12,
2005) ................................................................. 28, 30, 41, 43, 45, 48

*Aperture Software GmbH v. Avocent Huntsville Corp.*,
No. 5:14-cv-00211-JHE, 2015 U.S. Dist. LEXIS 193888 (N.D.
Ala. Jan. 5, 2015) ...........................................................26, 30, 34, 40

*Berkenhoff GmbH v. Glob. Trade Network, Inc.*,
No. 1:11-CV-00475, 2012 U.S. Dist. LEXIS 11579 (S.D. Ohio
Jan. 30, 2012)...................................................................................33

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*,
No. 90-cv-4169, 1990 U.S. Dist. LEXIS 17198 (S.D.N.Y. Dec. 18,
1990) .................................................................................................33

*Caroleng Invs. Ltd. v. Bluestone Res., Inc.*,
No. 1:20-cv-1793-RGA, 2021 U.S. Dist. LEXIS 86487 (D. Del.
May 6, 2021)...............................................................................40, 45

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
846 F.3d 35 (2d Cir. 2017) ...............................................................3

*Conproca, S.A. De C.V. v. Petroleos Mexicanos*,
No. 11-cv-9165, 2013 U.S. Dist. LEXIS 150141 (S.D.N.Y. Oct.
17, 2013) ...........................................................................................33

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
No. 19-3159, 2022 U.S. App. LEXIS 18837 (2d Cir. July 8, 2022) ...........21, 22

*Europcar Italia, S.P.A. v. Maiellano Tours,* 156 F.3d 310 (2d Cir.
1998) ..........................................................................................*passim*

*Getma Int'l v. Republic of Guinea*,
142 F. Supp. 3d 110 (D.D.C. 2015)............................................26, 36

*Hanwei Guo v. Deutsche Bank Sec.*,
  965 F.3d 96 (2d Cir. 2020) ...........................................................2, 39

*Higgins v. SPX Corp.*,
  No. 1:05-CV-846, 2006 U.S. Dist. LEXIS 20771 (W.D. Mich. Apr.
  18, 2006) ...........................................................................................33

*InterDigital Communs., Inc. v. Huawei Inv. & Holding Co.*,
  166 F. Supp. 3d 463 (S.D.N.Y. 2016) .......................... 26, 27, 29, 30, 33, 37, 40

*Inversiones Samekh v. Hot Springs Inv. LLC*,
  No. 10-24000-CV-ALTONAGA/BROWN, 2011 U.S. Dist. LEXIS
  165787 (S.D. Fla. Feb. 7, 2011) ..........................................41, 45, 48

*Jorf Lasfar Energy Co. v. AMCI Exp. Corp.*,
  No. 05-CV-0423, 2005 U.S. Dist. LEXIS 34969 (W.D. Pa. Dec.
  22, 2005) ....................................................................28, 30, 36, 41, 45

*Karaha Bodas Co. v. Negara*,
  335 F.3d 357 (5th Cir. 2003) ...............................................................49

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
  Bumi Negara*,
  500 F.3d 111 (2d Cir. 2007) .........................................................22, 37

*LLC SPC Stileks v. Republic of Mold.*,
  985 F.3d 871 (D.C. Cir. 2021)..............................................................28

*Manoukian v. Societe Generale de Banque au Liban S.A.L.*,
  [2022] EWHC 669 (QB)......................................................................12

*Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*,
  397 F. Supp. 3d 34 (D.D.C. 2019).......................................................31

*Nedagro B.V. v. Konversbank*,
  No. 02-cv-3946, 2003 U.S. Dist. LEXIS 787 (S.D.N.Y. Jan. 21,
  2003) ..................................................................................................33

*Novenergia II — Energy & Env't (SCA) v. Kingdom of Spain*,
  No. 18-cv-01148, 2020 U.S. Dist. LEXIS 12794 (D.D.C. Jan. 27,
  2020) ..................................................................................................30

*Spier v. Calzaturificio Tecnica, S.p.A.*,
   663 F. Supp. 871 (S.D.N.Y. 1987) ........................................................23, 24, 25

*Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*,
   864 F.3d 172 (2d Cir. 2017) .......................................................20, 31

*Ukrnafta v. Carpatsky Petroleum Corp.*,
   No. H-09-891, 2011 U.S. Dist. LEXIS 160485 (S.D. Tex. Oct. 12, 2011) .....................................................................38, 40

*ZF Auto. US, Inc. v. Luxshare, Ltd.*,
   142 S. Ct. 2078 (2022).................................................................2, 39

**Statutes and Treaties**

9 U.S.C. § 16 ..........................................................................4

9 U.S.C. § 202 ......................................................................21

9 U.S.C. § 203 ........................................................................4

9 U.S.C. § 207 ......................................................................21

28 U.S.C § 1291 ......................................................................4

28 U.S.C. § 1782.............................................. 2, 8, 9, 10, 11, 18, 39

Convention on the Recognition & Enforcement of Foreign Arbitral Awards ("New York Convention"), Dec. 29, 1970, 21 U.S.T. 2517. ...................................................................*passim*

## PRELIMINARY STATEMENT

In *Europcar Italia, S.P.A. v. Maiellano Tours*, this Court admonished that a district court "may be acting improvidently" if it enforces a foreign arbitral award "where a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside." 156 F.3d 310, 317 (2d Cir. 1998). In such circumstances, this Court emphasized that a district court "must take into account the inherent tension between competing concerns": (1) the parties' interests in "expeditious resolution of disputes and the avoidance of protracted and expensive litigation," on the one hand; and (2) the risk of "conflicting results," and "the consequent offense to international comity," on the other. *Id.* "The limited scope of review allowed [in the enforcing jurisdiction] also favors deference to proceedings in the originating country that involve less deferential standards of review on the premise that, under these circumstances, a foreign court well-versed in its own law is better suited to determine the validity of the award." *Id.*

The district court failed to heed that admonition in this case, granting Plaintiff-Appellee Iraq Telecom Limited's ("IT") request to enforce a foreign arbitral award issued in Lebanon, despite the fact that a motion to annul the award filed by Defendant-Appellant IBL Bank S.A.L. ("IBL") remains pending in the Lebanese Civil Court of Appeal. IBL's motion to annul raises substantial challenges to the validity of the award, which was based in part on "transfer evidence" obtained by IT

1

under the foreign discovery statute, 28 U.S.C. § 1782.  As this Court is no doubt aware, the Supreme Court recently held—consistent with this Court's precedent— that the foreign discovery statute <u>cannot</u> be used to obtain evidence for use in private international arbitrations like the one at issue here.  *See ZF Auto. US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2089 (2022); *see also Hanwei Guo v. Deutsche Bank Sec.*, 965 F.3d 96, 102-06 (2d Cir. 2020).  That decision validates IBL's argument that the Arbitral Tribunal convened in this case should not have admitted evidence obtained by IT under the foreign discovery statute, but the Lebanese court has not yet weighed in on the validity of the award under Lebanese law.

The district court denied IBL's request to stay enforcement of the award pending the outcome of the Lebanese proceedings based primarily on its desire to avoid "[f]urther delays … [which] would only protract this long-running and contentious dispute."  SPA-19.  The district court did not balance this interest in expedition against the "competing" concern of avoiding "conflicting results" and "the consequent offense to international comity," nor did it consider Lebanon's interests in resolving the validity of an arbitral award expressly governed by Lebanese law.  The district court's failure to consider these factors, despite this Court's clear guidance, was an abuse of discretion.

The district court also misread critical aspects of the record in this case, overlooking the undisputed facts that: (1) IBL filed its motion to annul the award in

2

Lebanon <u>before</u> it received notice of IT's sealed, *ex parte* efforts to enforce the award in the United States, and therefore could not have intended to "delay" these enforcement proceedings by moving to annul; and (2) IT already has obtained "suitable security" to recover the award if it ultimately prevails in the Lebanese action, because at least $3 million (the amount of the arbitral award) of IBL's assets remain attached in both the United States and Lebanon. Under this Court's precedent, both of these facts should have weighed heavily in favor of a stay. *See Europcar*, 156 F.3d at 317-18.

In short, the district court failed to carefully balance the "competing concerns" raised by a motion to enforce a foreign arbitral award that is currently subject to challenge in the originating country. Accordingly, the district court's order granting enforcement of the award should be reversed and remanded, with instructions to stay enforcement pending the outcome of the annulment action in Lebanon.[1]

---

[1] As this Court has recognized, there is "confusion" regarding the distinction between "confirmation" and "enforcement" of arbitral awards under the New York Convention. *See CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 846 F.3d 35, 52 (2d Cir. 2017). Because the award at issue in this case was issued in Lebanon, it is a "foreign" arbitral award, and the district court sits in a "secondary jurisdiction." *Id.* at 48. "[T]he proper term for the single-step process in which a federal district court engages when it sits in secondary jurisdiction over a foreign arbitral award is 'Enforcement.'" *Id.* at 52. Accordingly, throughout this brief, IBL refers to the district court proceedings as "enforcement" proceedings. The opinion below, however, refers to the same proceedings as "confirmation" of the award.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over Iraq Telecom's petition to enforce a foreign arbitration award pursuant to 9 U.S.C. §§ 203, 207. This Court has jurisdiction to review the district court's order enforcing the award pursuant to 9 U.S.C. § 16 and 28 U.S.C § 1291. The district court issued its decision enforcing the award on April 8, 2022 (SPA-23), and entered final judgment on April 15, 2022 (SPA-26). IBL timely filed a notice of appeal on April 15, 2022 (JA-921).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the district court abused its discretion in denying IBL's request to stay enforcement of a foreign arbitral award under Article VI of the New York Convention, which specifically authorizes a district court to "adjourn the decision on the enforcement of the award" if "an application for the setting aside or suspension of the award has been made to a competent authority [of the country in which that award was made]."

## STATEMENT OF THE CASE

Article VI of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards provides U.S. courts with discretion to stay enforcement of a foreign arbitration award pending the resolution of any challenge to that award in the issuing country. *See* Convention on the Recognition & Enforcement of Foreign Arbitral Awards ("New York Convention"), art. VI, Dec. 29, 1970, 21 U.S.T. 2517.

4

In this case, Defendant-Appellant IBL urged the district court (Cote, J.) to exercise that discretion to stay enforcement of a costs award, pending the resolution of an annulment action already underway in Lebanon. The district court declined that request, holding that the parallel proceedings in Lebanon were an insufficient reason to deny "immediate confirmation."[2] SPA-16-21. Because the district court misapplied several of the factors this Court has indicated should govern any request to stay enforcement under Article VI, the decision below should be reversed.

## I.     Iraq Telecom Initiates Arbitration to Resolve a Dispute with Its Former Business Partner.

This case arises from a dispute between Plaintiff-Appellee IT and its former business partner, Sirwan Saber Mustafa (whom IT calls "Barzani"). IT is a joint venture between a French company, Orange S.A., and a Kuwaiti company, Agility Public Warehousing Company KSCP. SPA-3. In 2009, IT acquired a minority stake in Korek Telecom Company LLC ("Korek"), an Iraqi telecommunications company co-founded and managed by Barzani. JA-53. Korek holds a license to operate a nationwide mobile telecommunications network in Iraq. *Id.*

---

[2] The district court's opinion is unreported, but is available electronically as: *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, No. 21-cv-10940, 2022 U.S. Dist. LEXIS 65729, 2022 WL 1063954 (S.D.N.Y. April 8, 2022).

To obtain its nationwide license, Korek agreed to pay the Iraqi government $1.25 billion in licensing fees. *Id.* In late 2011, Korek urgently sought additional funding to pay a substantial installment owed to the Iraqi government. SPA-4. Barzani arranged for Defendant-Appellant IBL, a Lebanese bank, to provide a $150 million loan to Korek to pay the installment and maintain its license. *Id.* The Loan Agreement expressly provided that it "shall be governed by the laws of the Republic of Lebanon." JA-38.

As part of the loan transaction, IT agreed to subordinate its interests as a creditor of Korek to the interests of IBL. SPA-4. IT claims that it did so only because it believed the IBL loan was unsecured, when instead Barzani allegedly provided collateral fully securing the loan (but hid that fact from IT). SPA-5; JA-725. When Korek defaulted on the loan in 2015, the Subordination Agreement required Korek to stop making interest payments to IT, and to pay interest only to IBL. SPA-5. According to IT, 96% of the interest paid on the IBL loan was returned by IBL to Barzani. SPA-5.

The Subordination Agreement contained an arbitration clause, which specifically provided:

> Any dispute, claim, question or disagreement arising out of or relating to this Agreement or the transactions contemplated herein (a "Dispute"), shall be settled by binding arbitration in accordance with the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry by one or more arbitrators, and

6

> the procedures set forth below. Judgment upon the award rendered by the arbitrator may be enforced in any court having jurisdiction over such dispute. The Arbitration is to take place in Beirut in the English language unless otherwise agreed by the parties. The award shall be final and binding and the parties waive their rights to lodge an appeal against the award. Nothing in this Agreement … shall prevent a party from seeking injunctive relief ….

JA-23. Like the loan agreement, the Subordination Agreement also expressly provided that it "shall be governed by the laws of the Republic of Lebanon." *Id.*

In 2018, IT invoked the arbitration clause to bring claims against IBL, Korek, and a holding company, International Holdings Limited ("IHL"). SPA-5. IT alleged that defendants committed *dol* (a Lebanese legal concept akin to fraud) by misrepresenting the IBL loan as unsecured, when in fact the loan was fully secured by Barzani. JA-112-135. Absent this alleged misrepresentation, IT claimed that it would not have agreed to subordinate its interests to the interests of IBL. *Id.*

## II. The Arbitral Tribunal Rejects Iraq Telecom's Request for Damages and Declaratory Relief, and Grants Only a Costs Award.

Pursuant to the arbitration clause, the parties engaged in binding arbitration before the Court of Arbitration of the Lebanese Arbitration and Mediation Center in Beirut from June 2018 to September 2021. IT sought to have the Subordination Agreement declared null and void, arguing that it had been fraudulently induced to enter the agreement by defendants' misrepresentations. JA-57. IT also initially brought a damages claim against IBL, requesting "an order that IBL pay damages to

7

the Claimant in an amount to be determined during the course of th[e] arbitration." *Id.* More than two years into the arbitration, however, IT withdrew its damages claim, and instead requested a declaration of its entitlement to "full compensation for damages ... that were directly or indirectly caused by entry into the Subordination Agreement, from the Respondents on a joint and several basis." JA-85, 107.

The Tribunal unanimously denied IT's request to declare IBL liable for damages on a joint-and-several basis, holding it "inadmissible under Lebanese law." JA-238, 284. Instead, a majority of the panel awarded IT only partial relief, declaring the Subordination Agreement null and void because all three respondents committed *dol*, which was the determinative factor in IT's decision to enter the Agreement. JA-271; *see also* JA-283 (finding IT only partially successful). The minority would not have invalidated the Agreement, finding IT agreed to subordinate its interests primarily to protect its investment in Korek by securing funding for Korek's urgent licensing fees. JA-271.

In holding the Subordination Agreement null and void, the Tribunal relied in part on "transfer evidence" obtained by IT in a separate proceeding in the Southern District of New York under the foreign discovery statute, 28 U.S.C. § 1782. JA-239-41. The transfer evidence purportedly showed that during the parties' negotiations over the IBL loan in December 2011, Barzani transferred $155 million from his account at HSBC Bank Middle East in Dubai to his account at IBL Bank in

8

Beirut.  JA-239.  IBL objected to the introduction of this evidence for two reasons: (1) IT's use of the foreign discovery statute was improper, because binding Second Circuit authority precludes the use of § 1782 for private international arbitrations; and (2) Lebanese banking secrecy laws prevented IT from disputing the accuracy of the purported transfer evidence.  JA-239-41.  The Tribunal overruled these objections, holding that it maintained independent discretion "to determine the admissibility of the Transfer Evidence," regardless of this Court's (or the Supreme Court's) "evolv[ing]" views on the proper use of the foreign discovery statute.  JA-240-41.

Finally, the Tribunal also apportioned the costs of the arbitration between the parties.  Because IT was only "partially successful on its main claims" and its "withdrawal of its claim for damages resulted in the [defendants] incurring additional costs," the Tribunal ordered IT to pay 20% of the parties' arbitration and representation costs, with defendants liable for the remaining 80%.  JA-283.  The Tribunal thus awarded IT $3,019,867.50 in costs, which was to be offset by over $250,000 owed by IT to IBL[3] (and $187,059.11 owed to the remaining defendants).  JA-284.

---

[3] The Tribunal specifically awarded IBL costs of USD 253,994.00; GBP 6,769.30; and EUR 585.50.  JA-284.  IT has not disputed that these amounts must be deducted from any costs award entered in its favor.

9

**III.    The Parties Dispute the Validity of the Arbitration Award in the Lebanese Courts.**

Two months after the Tribunal's decision, IT obtained a decision from the Court of First Instance in Beirut giving the arbitration award "executory effect."  JA-361.  The Lebanese court issued its order on November 23, 2021—nearly one month before IT initiated parallel proceedings in the United States (addressed separately below).  *Id.*

IBL responded by filing a motion to annul the award in the Arbitration Chamber of the Civil Court of Appeal in Beirut on January 14, 2022.  *See* JA-322, 361.  IBL's motion presented three grounds for annulment: (1) the Tribunal's reliance on "transfer evidence" obtained pursuant to 28 U.S.C. § 1782 violated a rule of international public order; (2) the Tribunal unfairly penalized IBL for complying with Lebanese banking secrecy laws, which precluded IBL from responding to evidence of the alleged Barzani transfer; and (3) the President of the Tribunal had a conflict-of-interest, based on recently-obtained disclosures regarding his connections to Orange S.A.  JA-332-51.  The annulment action remains pending before the Court of Appeal in Beirut.  Under Lebanese law, the arbitration award is unenforceable during the pendency of IBL's annulment action.  *See* SPA-54 (Lebanese Code of Civil Procedure Article 820); JA-362, 718-19.

On December 13, 2021, IT initiated a second arbitration proceeding against IBL in Lebanon.  SPA-6.  IT's claims in the second arbitration hinge on the validity

10

of the first Tribunal's findings, as IT seeks damages for IBL's alleged role in inducing IT to enter the Subordination Agreement. *Id.* Those claims remain pending before the Court of Arbitration of the Lebanese Arbitration and Mediation Center in Beirut.

On March 10, 2022, IT obtained an order from Judge Mariana Anani, the Head of the Beirut Execution Department, attaching IBL's property in Lebanon to secure the costs award from the first arbitration. JA-706. The order attaches all "Monies that belong to [IBL] among the mandatory reserves and commitments held by [the Banque du Liban ("BdL"), Lebanon's Central Bank]," as well as IBL's shares in five Lebanese companies, IBL's interests in six real estate properties, and all "assets of [IBL] existing at its headquarters" in Beirut. *Id.*

In response to the Lebanese attachment order, IBL attempted to pay the costs award from the first arbitration in Lebanon through the "tender and deposit" procedure established under Lebanese law. On March 22, 2022, IBL deposited a check made out to IT in the amount of USD $3,133,050.00 with a notary public in Beirut. *See* JA-772-73. Despite its choice to invoke the Lebanese court system to secure the costs award, IT refused IBL's tender and deposit, claiming that "IBL's tender and deposit of a banker's cheque … would not, in effect, be readily and reliably converted into the cash in the amount to which IBL is entitled under the

Award."[4]  JA-800.  The order attaching all of IBL's property in Lebanon to secure the costs award thus remains in effect, notwithstanding IBL's efforts to obviate that attachment by making a "tender and deposit" of the full gross amount of the costs award in Lebanon.

## IV.    Iraq Telecom Files an *Ex Parte* Motion Seeking Enforcement of the Award and Attachment of IBL's U.S. Correspondent Accounts in Aid of a Second Arbitration.

While the parties disputed the validity and enforcement of the costs award in Lebanon, IT also initiated parallel proceedings to enforce the award in the United States.  On January 27, 2022—two weeks after IBL filed its motion to annul the costs award in Lebanon—IBL received notice that IT had filed an *ex parte* motion in the Southern District of New York seeking to enforce the costs award and to attach all funds held in IBL's U.S. correspondent accounts in aid of the second arbitration.[5]  *See* JA-356.  According to IT's verified petition, an *ex parte* attachment order was necessary because IT was likely to obtain $97 million in damages in the second arbitration, and there was a "considerable risk" that IBL would "attempt to remove or

---

[4] Notably, other courts have held that a tender-and-deposit under Lebanese law extinguishes the underlying claim—here, the costs award.  *See Manoukian v. Societe Generale de Banque au Liban S.A.L.*, [2022] EWHC 669 (QB), ¶ 38 ("In his judgment (Khalifeh v. Blom Bank SAL [2021] EWHC 3399 (QB)), Foxton J held that Blom Bank had discharged the debt through the tender and deposit process.  He, accordingly, dismissed Mr. Khalifeh's claim.").

[5] IT apparently filed the *ex parte* petition under seal on December 14, 2021, *see* JA-319, but did not serve IBL until January 27, 2022.  JA-356.

dissipate assets" from its U.S. correspondent accounts to avoid enforcement. JA-306-07, 317. The *ex parte* petition did not mention a series of emergency measures adopted by BdL, which required IBL—like all Lebanese banks—to maintain substantial balances in its U.S. correspondent accounts to combat that country's economic crisis.[6]

The district court addressed the attachment issue first, before considering IT's request to enforce the $3 million costs award from the first arbitration. With the benefit of full briefing and a contested hearing,[7] the district court rejected any attachment of IBL's U.S. correspondent accounts exceeding $3 million (the amount of the costs award). JA-731. As the court explained, the "extraordinary circumstances" presented by Lebanon's economic crisis—including the substantial

---

[6] As IT has conceded throughout these proceedings (*see* JA-308), Lebanon is currently mired in a severe economic crisis. To address that crisis, BdL has adopted a series of emergency measures "to preserve depositors' access to fresh funds" and to safeguard "Lebanon's sovereign interest in protecting its banking system during a time of extreme financial stress." JA-765-66. These emergency measures include requirements that Lebanese banks, including IBL, hold customers' "fresh" funds (i.e., foreign-currency funds deposited in Lebanese banks after April 9, 2020) outside of Lebanon, and maintain a portion of all foreign-currency deposits in overseas correspondent accounts. The emergency measures and their effect on IBL's U.S. correspondent accounts are addressed in detail in the district court's decision on attachment. *See* JA-760-66.

[7] Before IBL had been served and appeared in the case, the district court granted IT's *ex parte* motion to attach all funds held in IBL's U.S. correspondent accounts. *See* JA-729-30. IBL subsequently opposed IT's motion to enforce the *ex parte* order and, as explained below, the district court vacated its prior order. *See* JA-731.

harms of continued attachment to IBL, third-party depositors, and the public interest—counseled against an attachment in aid of the second arbitration. JA-759-68. The district court further found that, even absent "extraordinary circumstances," IBL had not carried its burden of demonstrating a likelihood of success in obtaining a $97 million award against IBL in the second arbitration. JA-750-54.

IT appealed the district court's attachment decision, and that appeal remains pending before this Court. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, No. 22-540 (2d Cir. 2022). At this Court's urging, the parties also reached a temporary standstill agreement pending the resolution of IT's expedited appeal. *See* SPA-10-11. The temporary agreement provides that IBL's correspondent-account balances will not drop below $28 million during IT's appeal. *Id.* That agreement provides IT with substantial security for its claims against IBL, while providing IBL with a materially larger margin of liquidity to satisfy its urgent need to transact in fresh dollars for its customers. Like the Lebanese attachment order, the temporary standstill agreement remains in effect.

## V.     The District Court Refuses to Adjourn Enforcement of the Costs Award Pending Resolution of Annulment Proceedings in Lebanon.

Following the district court's decision on IT's *ex parte* motion to attach all funds held in IBL's U.S. correspondent accounts, the parties briefed IT's separate request to enforce the $3 million costs award from the first arbitration. Article VI of the New York Convention specifically authorizes a district court to "adjourn the

14

decision on the enforcement of the award" when "an application for the setting aside or suspension of the award has been made to a competent authority [of the country in which that award was made]."  New York Convention, art. VI, Dec. 29, 1970, 21 U.S.T. 2517.  Given the ongoing annulment proceedings in Lebanon (as well as the district court's orders attaching IBL's U.S. assets, the Lebanese attachment order securing IT's costs award, and IBL's attempts to pay the award via tender-and-deposit), IBL urged the district court to exercise its discretion to stay any decision on enforcement pending developments in Lebanon.

The district court denied IBL's request to stay enforcement, holding IT "has met its burden of showing an entitlement to <u>immediate confirmation</u> of the Award." SPA-21 (emphasis added).  Applying the factors identified by this Court in *Europcar*, the district court found that "[f]urther delays to await the resolution of the annulment action … would only protract this long-running and contentious dispute," thereby undermining "[t]he twin goals of arbitration" of "settling disputes efficiently and avoiding long and expensive litigation."  SPA-19.  While acknowledging that one factor ("whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review") favored a stay, the district court concluded that "[t]he balance of the *Europcar* factors weigh strongly against a stay."  SPA-20-21.

15

The district court's analysis and balancing of the *Europcar* factors are addressed in greater detail below. The net result of the district court's decision is that the costs award from the first arbitration has now been enforced in the United States—despite the fact that the parties continue to actively litigate the validity of the same award in Lebanon.

## SUMMARY OF ARGUMENT

Article VI of the New York Convention provides district courts with discretion to "adjourn" the enforcement of a foreign arbitral award if an application to set aside the award is pending in the country in which the award was made. *See* New York Convention, art. VI, Dec. 29, 1970, 21 U.S.T. 2517. In *Europcar*, this Court held that "a district court faced with a decision whether to adjourn arbitral enforcement proceedings" under Article VI "<u>must</u> take into account the inherent tension between competing concerns"—namely, "the goals of arbitration" to efficiently and expeditiously resolve disputes on the one hand, and the risk of "conflicting results," and "the consequent offense to international comity," on the other. *Europcar*, 156 F.3d at 317 (emphasis added). This Court proceeded to provide a non-exhaustive list of factors for district courts to balance when determining whether to adjourn enforcement of a foreign arbitral award pending the outcome of a challenge to the award in the foreign jurisdiction.

16

In this case, the district court appropriately recognized that it retained discretion under Article VI to stay enforcement of the costs award obtained by IT in the first arbitration, pending the outcome of IBL's motion to annul the award in Lebanon. SPA-16. The district court also correctly recognized the *Europcar* factors guide the inquiry into whether a stay of enforcement is warranted. SPA-17-18. The district court erred, however, in applying those factors to the specific circumstances presented in this case.

The first and second *Europcar* factors focus on the "general objectives" of arbitration to resolve disputes "expeditiously," and the "status of the foreign proceedings" challenging the same award. The district court abused its discretion in this case by focusing solely on the "immediate delay" caused by <u>any</u> request to stay enforcement of a foreign arbitral award, rather than considering the risk of further, protracted litigation if the court were to enforce an award that was subsequently set aside by the Lebanese court. Contrary to this Court's guidance, the district also failed to consider the international comity concerns that would arise if the Lebanese court ultimately determines the award—which is currently suspended under governing Lebanese law—is invalid. *See Europcar*, 156 F.3d at 317.

The third *Europcar* factor requires the court to consider whether the award will receive "greater scrutiny in the foreign proceedings under a less deferential standard of review." *Id.* The district court erred in this case by holding this factor

17

"only slightly" favored a stay, based on its cursory assessment of IBL's likelihood of success in the annulment action. SPA-20. The district court did not analyze any of the specific arguments presented in IBL's annulment action, nor did it explain its apparent conclusion that a Lebanese court will simply dismiss IBL's substantial claims regarding IT's improper use of the foreign discovery statute, 28 U.S.C. § 1782. Because Lebanese law governs both the arbitration proceedings and the annulment action, it is indisputable that IBL's claims will receive "greater scrutiny" in the Lebanese proceedings than they did in the district court.

The fourth *Europcar* factor requires the court to consider "the characteristics of the foreign proceedings," including whether the foreign action was "initiated <u>before</u> the underlying enforcement proceeding so as to raise concerns of international comity." *Europcar*, 156 F.3d at 318 (emphasis added). The district court clearly erred in this case by finding that IBL filed the annulment action "simply … to delay" enforcement proceedings, and failed to act "with alacrity" to contest the award. SPA-19-20. The undisputed record demonstrates that IBL filed the annulment action in Lebanon nearly two weeks <u>before</u> it received notice of IT's under-seal, *ex parte* efforts to enforce the award in the United States. For its part, IT also initiated proceedings in Lebanon to give the award "executory effect" several weeks <u>before</u> it sought to enforce the award in the United States. The "characteristics of the foreign proceedings," and the specific chronology of events in this case, thus

18

plainly support a stay of enforcement pending the outcome of the proceedings in Lebanon.

The fifth *Europcar* factor requires the court to consider the "balance of the possible hardships" that would be caused by a stay, "keeping in mind that if enforcement is postponed under Article VI …, the party seeking enforcement may receive 'suitable security.'" *Europcar*, 156 F.3d at 318. The district court clearly erred in this case by finding the balance of hardships weighed against a stay because IT "will have difficulty obtaining effective payment of the Award within Lebanon" and "there is a genuine question of whether IBL will honor its obligations." SPA-20. At all times prior to (and following) the district court's enforcement of the award, IT's interests were fully secured by the attachment of at least $3 million held in IBL's U.S. correspondent accounts. IT also has received additional security through a Lebanese order attaching all of IBL's property in Lebanon, IBL's "tender and deposit" of a check satisfying the gross amount of the costs award, and the supersedeas bond posted by IBL pending this appeal. Contrary to the district court's conclusion, IT therefore would have no "difficulty" obtaining payment if the district adjourned enforcement of the award to await the outcome of the annulment action.

Finally, the sixth *Europcar* factor allows the court to consider "any other circumstances that could tend to shift the balance in favor of or against adjournment." *Europcar*, 156 F.3d at 318. The district court did not identify any

such "circumstance," but instead concluded "immediate confirmation" was warranted based primarily on its desire to avoid "[f]urther delays." SPA-19-21. Consistent with this Court's guidance, however, the district court should have balanced this interest in "expeditious" resolution with "competing concerns," such as "the possibility of conflicting results and the consequent offense to international comity." *Europcar*, 156 F.3d at 317. The district court did not mention—let alone weigh—Lebanon's interests in determining the validity, in the first instance, of an arbitration award rendered under Lebanese law, by an arbitral tribunal convened in Lebanon, against a Lebanese bank, under a commercial agreement governed "by the laws of the Republic of Lebanon." The district court's failure to consider and weigh these comity considerations was an abuse of discretion.

## STANDARD OF REVIEW

This Court reviews "a district court's decision whether to adjourn [enforcement of a foreign arbitration award] for abuse of discretion." *Europcar*, 156 F.3d at 317. "A court abuses its discretion when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 181 (2d Cir. 2017) (internal quotation omitted); *see also*

20

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, No. 19-3159, 2022 U.S. App. LEXIS 18837, *34 (2d Cir. July 8, 2022).

## ARGUMENT

### I. The District Court Abused Its Discretion in Declining to Stay Enforcement Pending Resolution of Ongoing Annulment Proceedings in Lebanon.

The recognition and enforcement of foreign arbitral awards in the United States is governed by the New York Convention, as implemented by the Federal Arbitration Act ("FAA"). *See* New York Convention, Dec. 29, 1970, 21 U.S.T. 2517; 9 U.S.C. § 202. Section 207 of the FAA specifically provides that, "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration." 9 U.S.C. § 207. Section 207 further provides that "[t]he court shall confirm the award <u>unless</u> it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *Id.* (emphasis added).

The New York Convention, in turn, specifies the grounds upon which a court may refuse or defer recognition or enforcement of a foreign arbitration award. Article V of the Convention lists seven grounds upon which a court may refuse to enforce a foreign arbitration award. *See* New York Convention, art. V(1), (2), Dec. 29, 1970, 21 U.S.T. 2517. One of these grounds is that "[t]he award has not yet

21

become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."[8] *Id.*, art. V(1)(e); *see also Esso*, 2022 U.S. App. LEXIS 18837 at *11 ("In practice, … our Circuit has treated a primary jurisdiction's decision to set aside an arbitral award as conclusive, binding the U.S. court from which enforcement is sought. This practice is dictated by the principle of international comity.").

Article VI of the Convention specifies the circumstances in which a court may defer recognition or enforcement of a foreign arbitration award. Article VI specifically provides:

> If an application for the setting aside or suspension of the award has been made to a competent authority [of the country in which, or under the law of which, that award was made], the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

New York Convention, art. VI, Dec. 29, 1970, 21 U.S.T. 2517. Article VI works hand-in-glove with Article V(1)(e)'s provision that a court may refuse to enforce an

---

[8] Under the Convention, the country in which the award is made "is said to have primary jurisdiction over the arbitration award." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007). All other signatories to the Convention (including the United States, in this case) are "secondary jurisdictions," which maintain only limited authority to decline to enforce arbitral awards issued in the primary jurisdiction. *Id.*

award that has been set aside or suspended in the country of issuance.  As one of the earliest decisions addressing these provisions explained, "[Article V(1)(e)'s] basis for refusal of enforcement would have been nullified if the Convention did not also empower the courts of the country where enforcement is sought to at least consider the pendency of a challenge in the country of issuance. That is the office performed by Article VI."  *Spier v. Calzaturificio Tecnica, S.p.A.*, 663 F. Supp. 871, 875 (S.D.N.Y. 1987).

In this case, IBL requested that the district court exercise the discretion afforded under Article VI of the Convention to "adjourn the decision on the enforcement of" the costs award pending the resolution of its motion to annul the award in Lebanon.  As explained below, the district court abused its discretion in denying IBL's request to adjourn enforcement of the award, given the pending annulment proceedings in Lebanon and the comity concerns that arise in such circumstances.

**A.**    **Article VI of the New York Convention Grants District Courts Discretion to Stay Enforcement Proceedings Pending Challenges to an Award in the Primary Jurisdiction.**

This Court addressed the scope of a district court's authority to stay enforcement of a foreign arbitral award in *Europcar*, 156 F.3d at 316-18.  Like IT in this case, the plaintiffs in *Europcar* sought enforcement of a foreign arbitral award in a U.S. district court while a challenge to the award was still underway in the

primary jurisdiction (in that case, Italy). *Id.* at 313. This Court began by underscoring that Article VI of the Convention expressly provides district courts with "discretion to adjourn enforcement proceedings where an application has been made in the originating country to have the arbitral award set aside or suspended." *Id.* at 316.

After noting the lack of authority addressing "[t]he circumstances under which a district court should adjourn enforcement proceedings," this Court explained: "It is plain to us … that a district court faced with a decision whether to adjourn arbitral enforcement proceedings to await the outcome of foreign proceedings <u>must</u> take into account the inherent tension between competing concerns." *Id.* at 317 (emphasis added). "On the one hand, the adjournment of enforcement proceedings impedes the goals of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation …. A stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *Id.*

"On the other hand," this Court emphasized, "certain considerations favor granting a stay. One of the grounds for refusing to enforce an award under Article V(1)(e) is if the award 'has been set aside or suspended by a competent authority of the country in which … the award was made.'" *Id.* (alteration in original). "Thus, where a parallel proceeding is ongoing in the originating country and there is a

24

possibility that the award will be set aside, <u>a district court may be acting</u> <u>improvidently by enforcing the award prior to the completion of the foreign</u> <u>proceedings.</u>" *Id.* (emphasis added). "The limited scope of review allowed under the Convention also favors deference to proceedings in the originating country that involve less deferential standards of review on the premise that, under these circumstances, a foreign court well-versed in its own law is better suited to determine the validity of the award." *Id.*

When confronted with a request to stay enforcement of a foreign arbitral award under Article VI, this Court thus held that "a proper balancing of these concerns should lead a district court to consider several factors," including:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;

> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;

> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under

25

circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive "suitable security" and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country; and

(6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

*Id*. at 317-18 (internal citation omitted). "Because the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards, the first and second factors on the list should weigh more heavily in the district court's determination." *Id*. at 318.

Following *Europcar*, courts both within and outside this Circuit routinely apply these factors to adjourn enforcement of a foreign arbitral award under Article VI of the Convention. *See, e.g.*, *InterDigital Communs., Inc. v. Huawei Inv. & Holding Co.*, 166 F. Supp. 3d 463, 471 (S.D.N.Y. 2016) (holding *Europcar* factors weighed in favor of staying enforcement proceedings); *Getma Int'l v. Republic of Guinea*, 142 F. Supp. 3d 110, 119 (D.D.C. 2015) ("On balance, the *Europcar* factors lead the Court to the conclusion that the proceedings in this case should be stayed."); *Aperture Software GmbH v. Avocent Huntsville Corp.*, No. 5:14-cv-00211-JHE, 2015 U.S. Dist. LEXIS 193888, at *24 (N.D. Ala. Jan. 5, 2015) ("[The *Europcar*

26

factors] weigh in favor of a stay pending the resolution of the foreign proceeding in the Vienna Commerce Court.").  When the *Europcar* factors "tip decidedly in favor of staying [enforcement]," a district court should exercise its discretion to "adjourn" proceedings under Article VI "to await the outcome of the proceedings in [the foreign jurisdiction] to annul the Award."  *InterDigital Communs.*, 166 F. Supp. 3d at 471.

**B.     The District Court Failed to Properly Apply the *Europcar* Factors in Denying IBL's Request to Stay Enforcement.**

In this case, the district court appropriately recognized that it retained discretion under Article VI of the Convention to "adjourn" enforcement proceedings "if it considers it proper."  SPA-16.  The district court also correctly recognized that this Court's decision in *Europcar* provides a non-exhaustive list of factors for courts to consider in determining whether a stay of enforcement is appropriate.  SPA-17-18.  The district court erred, however, in applying those factors to the specific circumstances presented in this case.  As explained in further detail below, the district court misinterpreted several factors, failed to consider Lebanon's interests in determining the validity of the costs award in the first instance, and failed to recognize that the balance of hardships tips decidedly in IBL's favor, given the various forms of security IBL has posted to satisfy the costs award.

27

1. **The District Court Misinterpreted the First Factor, Which Favors Granting a Stay to Avoid Protracted and Expensive Parallel Litigation.**

Under the first *Europcar* factor, the court must consider "the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation." *Europcar*, 156 F.3d at 317.

When assessing this factor, courts consider two distinct criteria. First, courts examine whether the "immediate delay" that would be caused by a stay of enforcement is likely to exceed the "possible delay" that would occur if the court were to immediately enforce an award that is subsequently set aside in the foreign proceeding, necessitating a second round of litigation to vacate a precipitous enforcement order. *Jorf Lasfar Energy Co. v. AMCI Exp. Corp.*, No. 05-CV-0423, 2005 U.S. Dist. LEXIS 34969, at *7-8 (W.D. Pa. Dec. 22, 2005); *see also Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*, No. 04 C 7731, 2005 U.S. Dist. LEXIS 7479, *11-12 (N.D. Ill. Apr. 12, 2005). Second, courts consider whether a stay is necessary to avoid the risk of inconsistent results in the primary and secondary jurisdictions, which would not only implicate "issues of international comity," but also threaten more protracted, expensive litigation. *Alto Mar Girassol*, 2005 U.S. Dist. LEXIS 7479 at *12; *see also LLC SPC Stileks v. Republic of Mold.*, 985 F.3d 871, 880 (D.C. Cir. 2021) (noting the first two *Europcar* factors "directly implicate the court's responsibility to balance the Convention's policy favoring confirmation

28

of arbitral awards against the principle of international comity embraced by the Convention" (internal quotation omitted)).

In this case, the district court found that the first factor "weigh[s] in favor of immediate confirmation" based solely on its consideration of the immediate delay that would be caused by a stay. SPA-19. The court noted the award was the product of "three years of proceedings before the Tribunal," and found that "[f]urther delays to await the resolution of the annulment action, which is in its earliest stage, would only protract this long-running and contentious dispute." *Id.* On that basis, the court concluded that "[t]he twin goals of arbitration, 'settling disputes efficiently and avoiding long and expensive litigation,' favor expeditious execution of the Award." *Id.* (internal quotation omitted). The district court's analysis reflects a fundamental misapplication of the first *Europcar* factor, for two reasons.

First, by focusing solely on the "immediate delay" that would be caused by a stay of enforcement proceedings, the district court failed to consider whether the immediate delay was likely to exceed the potential delay that would arise if the Lebanese court ultimately annuls the award, which would oblige the district court to reopen and vacate its enforcement order. Naturally, any request to stay enforcement of a foreign arbitral award under Article VI will cause some further delay in the resolution of the parties' dispute. But such delay, standing alone, is insufficient to tilt the balance in plaintiffs' favor under the first *Europcar* factor. *See InterDigital*

29

*Communs.*, 166 F. Supp. 3d at 472 (noting that courts regularly opt "to stay proceedings in enforcement actions until the resolution of a proceeding to set aside an award in the originating country"). Otherwise, the first factor <u>always</u> would weigh in favor of denying a stay of enforcement under Article VI.

Rather than focusing solely on the immediate delay that would be caused by a stay of enforcement, the district court should have analyzed whether a stay was necessary to avoid more protracted litigation in the event the Lebanese court ultimately annuls the award. Courts applying the first *Europcar* factor regularly draw this distinction, emphasizing that a stay of enforcement to await the results of the foreign proceeding may "actually serve the objectives of resolving disputes expeditiously and avoiding protracted and expensive litigation." *Jorf Lasfar Energy Co.*, 2005 U.S. Dist. LEXIS 34969 at *7-8 (finding "[t]he delay that will be caused immediately is likely shorter than the possible delay that would occur if this court were to confirm the award and the French court then set it aside"); *see also Alto Mar Girassol*, 2005 U.S. Dist. LEXIS 7479 at *11-12 (same); *Aperture Software*, 2015 U.S. Dist. LEXIS 193888, at *13 ("staying enforcement, although causing an immediate delay, … will actually serve the objectives of resolving disputes expeditiously and avoiding protracted and expensive litigation." (internal quotation omitted)); *Novenergia II — Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-cv-01148, 2020 U.S. Dist. LEXIS 12794, *10 (D.D.C. Jan. 27, 2020) ("[I]n the short

run, while a stay may well 'delay the resolution' of the dispute, in the long run, a stay will still likely be shorter than the possible delay that would occur if this Court were to confirm the award and the Svea Court of Appeal were to … then set it aside." (internal quotations omitted)).

Indeed, as this Court's recent decision in *Thai-Lao Lignite Co.* illustrates, such concerns are not merely theoretical. *See Thai-Lao Lignite Co.*, 864 F.3d at 175. There, the district court entered an order under Article IV of the Convention enforcing a Malaysian arbitration award. The next year, a Malaysian court set aside the award. Then, "[r]eturning to the United States with the Malaysian judgment in hand, Laos moved under Federal Rule of Civil Procedure 60(b)(5) to vacate the District Court's August 2011 judgment enforcing the Award." *Id*. The parties proceeded to dispute the scope of the district court's review in light of "the prudential concern of international comity," and the standards applicable under Rule 60(b)(5). *Id*. at 176. Accordingly, what could have been a relatively short proceeding if the district court had stayed enforcement pending the results of the Malaysian proceeding instead turned into a long, drawn-out, and no-doubt expensive proceeding lasting nearly eight years. *See id.* (arbitration award issued in 2009; Second Circuit opinion issued in 2017). "Such an outcome is precisely the opposite of what arbitration attempts to promote: the swift and (relatively) simple disposition of litigation." *Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F. Supp.

31

3d 34, 39-40 (D.D.C. 2019) (granting stay under Article VI "in the interest of avoiding cross-border, piecemeal litigation").

In this case, the district court failed to consider the additional delays that could result if IBL ultimately succeeds in the ongoing Lebanese annulment action, and instead focused solely on the "immediate delay" that naturally results from any request to adjourn enforcement under Article VI.[9] As the authority above demonstrates, such incomplete application of the first *Europcar* factor fundamentally subverts its objective.

<u>Second</u>, the district court similarly failed to consider the risk that enforcing an arbitral award currently under challenge in Lebanon may lead to inconsistent results, thereby raising concerns of international comity and judicial economy. The district court brushed any such concerns aside, focusing only on the short-term delay caused by staying enforcement. SPA-19-21. But as this Court explained in *Europcar*, "where a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside, a district court may be acting improvidently by enforcing the award prior to the completion of the foreign proceedings." 156 F.3d at 317.

---

[9] To the extent the district court's analysis of the first *Europcar* factor reflected its dour assessment of IBL's likelihood of succeeding in the annulment action, that issue is addressed separately in Section I-B-3 below.

Consistent with this Court's instruction, most courts analyzing the first factor stay enforcement of the award as a matter of comity, when a challenge to the award is already pending in the primary jurisdiction. *See, e.g.*, *InterDigital Communs.*, 166 F. Supp. 3d at 471-72 (staying enforcement to "avoid duplication" and "the possibility of inconsistent results [with] the Paris court's decision on whether to vacate the Award"); *Conproca, S.A. De C.V. v. Petroleos Mexicanos*, No. 11-cv-9165, 2013 U.S. Dist. LEXIS 150141, at *7-8 (S.D.N.Y. Oct. 17, 2013) (granting stay of enforcement of Mexican arbitral award "to respect Mexico's interest in determining the validity of the award under Mexican law"); *Nedagro B.V. v. Konversbank*, No. 02-cv-3946, 2003 U.S. Dist. LEXIS 787, at *23 (S.D.N.Y. Jan. 21, 2003) (adjourning enforcement under Article VI because court was "loath to risk the possibility of an inconsistent result" in the primary jurisdiction); *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, No. 90-cv-4169, 1990 U.S. Dist. LEXIS 17198, at *21 (S.D.N.Y. Dec. 18, 1990) (granting stay because "the Nigerian courts are better equipped than this Court to determine the proper application of [Nigerian] law"); *Higgins v. SPX Corp.*, No. 1:05-CV-846, 2006 U.S. Dist. LEXIS 20771, at *14 (W.D. Mich. Apr. 18, 2006) (holding international comity concerns "strongly favor staying" enforcement "to await the decision of the [the primary jurisdiction] as to the nullification action"); *Berkenhoff GmbH v. Glob. Trade Network, Inc.*, No. 1:11-CV-00475, 2012 U.S. Dist. LEXIS 11579, *6 (S.D.

Ohio Jan. 30, 2012) (staying enforcement "until after such time the [primary jurisdiction] has concluded its review"); *Aperture Software*, 2015 U.S. Dist. LEXIS 193888, at \*17 (staying enforcement because the "challenge [pending] in the Austrian courts raises issues of Austrian law that [the Austrian] court should have at least one opportunity to address").

Rather than balancing the parties' interests in efficiency against the risk of "conflicting results and the consequent offense to international comity," *Europcar*, 156 F.3d at 317, the district court focused solely on the length of the arbitral proceedings and the incremental delay that would be caused by staying enforcement. The opinion below does not so much as mention Lebanon's interests in determining the validity of the costs award, or the international comity concerns that would arise if the Lebanese court ultimately annuls the award. The district court's failure to consider these issues was an abuse of discretion.

## 2. The District Court Misapplied the Second Factor, Because the Annulment Action Is Proceeding in Due Course in Lebanon.

Under the second *Europcar* factor, the court must consider "the status of the foreign proceedings and the estimated time for those proceedings to be resolved." *Europcar*, 156 F.3d at 317. The district court devoted just a single sentence to this factor, faulting IBL for not providing "any reliable estimate, or even any estimate,

of how long its action to set aside the Award may take." SPA-19. This cursory analysis failed to properly account for the second *Europcar* factor, for two reasons.

First, contrary to the district court's finding, IBL presented undisputed evidence that "[d]espite the challenges resulting from the current crisis in Lebanon," the Lebanese courts are functioning normally, "relief is available" through the Lebanese court system, and IBL's annulment action "should be addressed generally pursuant to a typical timeline by the Lebanese Civil Court of Appeals." *See* JA-713, 718; *see also* JA-696. While it is true that IBL did not speculate as to the specific length of time that it will take for the Court of Appeals to rule on its annulment motion, there is no evidence in the record to support the district court's apparent assumption that the Lebanese proceedings will be lengthy. To the contrary, IT readily obtained an "executory" decision from the Lebanese courts recognizing the first arbitral award only two months after the Tribunal issued its decision. *See* JA-360-61, 714. Similarly, during the pendency of its own enforcement motion in the district court, IT just as readily obtained an attachment order through the Lebanese courts. *See* JA-706.

Second, in assessing "the status of the foreign proceedings" under the second *Europcar* factor, the district court should have considered the fact that, as a matter of governing Lebanese law, IBL's filing of the annulment action automatically suspended enforcement of the arbitral award. *See* SPA-54; JA-362, 718-19. As

35

other courts have noted, an automatic stay of enforcement under foreign law—while not "binding" on the district court under the New York Convention—is nonetheless "highly relevant to a consideration of the overall nature and circumstances of the [foreign] proceeding." *Jorf Lasfar*, 2005 U.S. Dist. LEXIS 34969 at *9. Indeed, where an award is "automatically stayed" in the primary jurisdiction, it "certainly is more prudent to" stay enforcement in the secondary jurisdiction. *Getma*, 142 F. Supp. 3d at 115-16.

In this case, the district court concluded that the suspension of the arbitral award under Lebanese law did not provide a basis to <u>deny</u> enforcement under Article V(1)(e) of the Convention, *see* SPA-11-16, but it failed to afford the suspension of the award any weight when considering whether to <u>adjourn</u> enforcement under Article VI of the Convention. *See* SPA-16-21. The district court's failure to consider the automatic suspension provided under Lebanese law when assessing "the status of the foreign proceedings" under the second *Europcar* factor was an abuse of discretion. *See Jorf Lasfar*, 2005 U.S. Dist. LEXIS 34969 at *9 (finding automatic suspension of arbitral award under French law "especially significant").

> **3.  The District Court Improperly Discounted the Third Factor, Which Favors a Stay Because the Award Will Receive Greater Scrutiny in Lebanon.**

The third *Europcar* factor requires the court to consider "whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under

a less deferential standard of review." *Europcar*, 156 F.3d at 317. Given the "limited scope of review allowed under the Convention" in a secondary jurisdiction (such as the United States, in this case), the third factor "favors deference to proceedings in the originating country that involve less deferential standards of review on the premise that, under these circumstances, a foreign court well-versed in its own law is better suited to determine the validity of the award." *Id*.; *see also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007) (explaining that while "courts of a *primary* jurisdiction may apply their own domestic law when evaluating an attempt to annul or set aside an arbitral award, courts in countries of *secondary* jurisdiction may refuse enforcement only on the limited grounds specified in Article V."); *InterDigital Communs.*, 166 F. Supp. 3d at 472-73 ("The French courts can apply the specific grounds for refusing to enforce the Award found in Article V of the Convention, and can also rely on any relevant provisions of local law.").

The district court correctly recognized that the third factor weighs in favor of a stay in this case. Because Lebanon is "the primary jurisdiction," "a Lebanese court in an annulment action may be able to rely on a broader range of grounds to vacate the Award than the seven defenses contained in [Article V of] the Convention." SPA-20-21. Accordingly, the costs award "will receive greater scrutiny" in the annulment proceedings, a fact warranting deference under *Europcar*. *See, e.g.*,

37

*Ukrnafta v. Carpatsky Petroleum Corp.*, No. H-09-891, 2011 U.S. Dist. LEXIS 160485, at *12 (S.D. Tex. Oct. 12, 2011) ("The third factor also weighs in favor of adjournment because the standards for review in the two Swedish appeals certainly have a less deferential standard for affirming the award than the extremely deferential standard under Article V.").

The district court erred, however, in discounting the weight afforded to the third factor based upon its truncated assessment of IBL's likelihood of succeeding in the annulment action. The district court concluded the third factor "only slightly" favored a stay, because "IBL has not shown that it is likely to succeed on either of the two grounds on which it relies in its annulment proceeding." SPA-20-21; *see also* SPA-16 (holding, without analysis, that "IBL has failed to demonstrate a likelihood of success in the annulment action" because "neither [of its grounds for vacating the Award] appears to be meritorious"). The district court did not analyze any of the grounds presented in IBL's motion to annul, nor did it explain its apparent conclusion that a Lebanese court would not be troubled by IT's improper use of the foreign discovery statute or the Tribunal's unwillingness to consider the constraints imposed on IBL by Lebanon's banking secrecy laws.

Contrary to the district court's abbreviated assessment, more recent developments confirm that IBL's annulment action raises serious issues for the Lebanese courts to consider. As noted above, IBL makes a substantial claim in the

38

annulment action that IT improperly used the foreign discovery statute, 28 U.S.C. § 1782, to obtain wire transfer records for use in a private commercial arbitration. *See supra* at 8-10. Just last month, the U.S. Supreme Court validated IBL's position, holding the foreign discovery statute does <u>not</u> permit a district court to order the production of documents for use in a private, international commercial arbitration. *See ZF Auto.*, 142 S. Ct. at 2089. Rather, the Court held the foreign discovery statute "reaches only governmental or intergovernmental adjudicative bodies," and confirmed that "private adjudicatory bodies"—such as the arbitral tribunal convened in this case—"do not fall within § 1782." *Id.* at 2083, 2089.

As the Supreme Court's recent decision makes clear, IBL had substantial grounds to object to the Tribunal's admission of IT's § 1782 "transfer evidence" in this case—particularly because, as the Tribunal acknowledged (*see* JA-240-41), this Court had already precluded the use of § 1782 in private, international commercial arbitrations even before the Supreme Court's decision. *See Hanwei Guo*, 965 F.3d at 102-06 (holding private foreign arbitrations fall outside § 1782). The Tribunal's decision to admit such evidence (and IBL's related claim that Lebanese banking secrecy laws precluded it from responding to such evidence) will receive "greater scrutiny" in the annulment proceedings, given that Lebanon is the primary jurisdiction in this case. Accordingly, the third *Europcar* factor strongly favors a stay of enforcement. The district court abused its discretion in discounting this factor

based upon its cursory assessment of IBL's likelihood of success in the annulment action.

> **4.** **The District Court Clearly Erred in Applying the Fourth Factor, Because IBL Filed the Annulment Action in Lebanon Before Receiving Notice of IT's U.S. Action.**

The fourth *Europcar* factor requires the court to consider "the characteristics of the foreign proceedings," including "whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity," "whether they were initiated by the party now seeking to enforce the award in federal court," and "whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute." *Europcar*, 156 F.3d at 318. This factor reflects the broader concern that "stays should not be used to delay resolution unnecessarily." *InterDigital Communs.*, 166 F. Supp. 3d at 473.

In assessing the fourth factor, courts follow "the general principle that a court handling a second-filed action should show deference to a court handling a first-filed action." *Caroleng Invs. Ltd. v. Bluestone Res., Inc.*, No. 1:20-cv-1793-RGA, 2021 U.S. Dist. LEXIS 86487, at *8 (D. Del. May 6, 2021). That is, where an action is already pending in the primary jurisdiction, "concerns of international comity weigh more strongly in favor of staying enforcement" in a secondary jurisdiction. *Aperture*, 2015 U.S. Dist. LEXIS 193888, at *14; *see also Ukrnafta*, 2011 U.S. Dist. LEXIS 160485, at *12 ("[T]he fact that the annulment proceedings were filed prior

40

to Carpatsky's motion to enforce in this case raises concerns of international comity."); *Inversiones Samekh v. Hot Springs Inv. LLC*, No. 10-24000-CV-ALTONAGA/BROWN, 2011 U.S. Dist. LEXIS 165787, at *12 (S.D. Fla. Feb. 7, 2011) (explaining that "ignoring" ongoing proceedings in the primary jurisdiction "would raise concerns about international comity"). For this reason, courts generally weigh the fourth factor in favor of a stay so long as there is no evidence the foreign proceeding was filed "to hinder or delay resolution of [the] dispute." *Jorf Lasfar*, 2005 U.S. Dist. LEXIS 34969, at *8; *see also Alto Mar*, 2005 U.S. Dist. LEXIS 7479, at *12 (staying enforcement where foreign appeal was pending prior to enforcement action and there was no evidence of intent to hinder or delay).

The district court failed to properly apply these principles in this case, wrongly concluding the fourth *Europcar* factor "counsels against a delay in confirmation." SPA-19. The district court criticized IBL for failing to act "with alacrity" in challenging the award in Lebanon, claiming it "waited to commence its action to set aside the Award for roughly fourth months after the Award was issued and for almost two months after Iraq Telecom obtained executory effect for the Award from a Lebanese court." *Id.* The court further opined that "the weakness of [IBL's] arguments in the annulment action reinforce the impression that IBL is simply seeking to delay the inevitable confirmation." SPA-19-20. These findings are clearly erroneous, for four reasons.

41

First, the record does not support the district court's conclusion that IBL failed to act "with alacrity" to challenge the award in Lebanon. The Tribunal issued the award on September 21, 2021. JA-285. IT then waited over two months to obtain an order from a Lebanese court giving the arbitration award "executory effect," which finally issued on November 23, 2021. JA-360-61. IBL did not receive notice of that order until December 16, 2021. JA-324. Less than one month later, IBL responded to that order by filing a motion to annul the award in the Civil Court of Appeal in Beirut on January 14, 2022. JA-322, 361. There is no dispute that IBL moved to annul the award in Lebanon well within the statutory period for filing such an action. *See* SPA-52 (Lebanese Code of Civil Procedure Article 819) (providing motion to annul international arbitration award must be filed within 30 days of "notification date of the decision giv[ing] the exequatur"). IBL thus acted with more "alacrity" than IT, which waited more than two months to confirm the award in Lebanon (and nearly three months to file its *ex parte* petition in the Southern District). *See* JA-289, 319, 360-61. The undisputed record evidence therefore does not support the district court's finding that IBL purportedly slept on its rights, while IT "acted diligently in the United States and Lebanon to enforce the Award." SPA-19-20.

Second, the district court overlooked the critical fact that IBL filed the annulment action in Lebanon before it received notice of IT's under-seal and *ex parte*

efforts to enforce the award in the United States. IBL moved to annul the award in Beirut in January 14, 2022, but did not receive notice of IT's under-seal action in the Southern District until January 27, 2022. *See* JA-356, 361. The chronology of events in this case thus squarely rebuts the district court's supposition that IBL filed the annulment action "simply [to] delay" these enforcement proceedings, SPA-20, as it is undisputed IBL was not even aware of those then-sealed proceedings when it filed the annulment action in Beirut.

Third, the district court similarly failed to consider the fact that IT, "the party now seeking to enforce the award in federal court," itself initiated proceedings in Lebanon before filing this enforcement proceeding. *Europcar*, 156 F.3d at 318. Three weeks prior to the filing of its sealed *ex parte* petition in the Southern District, IT sought an order from the Court of First Instance in Beirut to give the award "executory effect." JA-360-61. IT subsequently obtained an order from the Beirut Execution Department attaching all of IBL's property in Lebanon to secure the award. JA-706. IT thus initiated parallel proceedings in Lebanon addressing the same arbitral award at issue in this case, which "raise[s] concerns of international comity." *Europcar*, 156 F.3d at 318. The district court's failure to consider these "characteristics of the foreign proceedings" under the fourth factor was an abuse of discretion. *Id.*

43

Fourth, there is no merit to the district court's unsupported assertion that the "the weakness of [IBL's] arguments in the annulment action reinforce the impression that IBL is simply seeking to delay the inevitable confirmation."  SPA-19-20.  As noted above, IBL's motion to annul raises serious issues regarding the Tribunal's decision to admit evidence obtained by IT under the foreign discovery statute.  The Supreme Court's recent decision in *ZF Automotive*, as well as the chronology outlined above, rebut any claim that IBL filed the annulment action simply to delay enforcement of the award.  The district court abused its discretion by inferring some purported intent to delay, without actually analyzing the strength of IBL's arguments or accurately accounting for the chronology of events in this case.

> **5.     The District Court Clearly Erred in Applying the Fifth Factor, Because the U.S. Attachment Order, the Lebanese Attachment Order, and IBL's Supersedeas Bond All Provide IT with Sufficient Security.**

The fifth *Europcar* factor requires the court to consider the "balance of the possible hardships to each of the parties."  *Europcar*, 156 F.3d at 318.  In assessing the fifth factor, this Court has specifically instructed the district courts to "keep[] in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive 'suitable security' and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the

originating country." *Id.* Accordingly, this factor weighs in favor of staying enforcement of a foreign arbitral award if the defendant demonstrates the funds necessary to satisfy the award are "unlikely to disappear," and the claimant suffers no real harm as a result of its inability to immediately collect on the award. *Inversiones Samekh*, 2011 U.S. Dist. LEXIS 165787 at *13; *see also Jorf Lasfar*, 2005 U.S. Dist. LEXIS 34969 at *9 (holding balance of hardships favored stay of enforcement because defendants' posting of security provided "adequate assurances of prompt payment"); *Caroleng*, 2021 U.S. Dist. LEXIS 86487 at *10 (holding that posting of security "weighs in favor of granting the motion to stay").

The district court clearly erred in this case by failing to consider the various ways in which IBL has already posted adequate security, eliminating the risk of any hardship to IT. The district court found the balance of hardships weighed against staying enforcement, because IT "will have difficulty obtaining effective payment of the Award within Lebanon," and "there is a genuine question of whether IBL will honor its obligations under the Award" due to its "precarious financial condition." SPA-20. Absent from this discussion, however, is any mention of at least three separate ways in which IBL has already guaranteed that IT will have no "difficulty" obtaining payment for the costs award at the conclusion of the annulment proceedings.

45

First, long before it granted enforcement of the costs award, the district court attached up to $100 million of IBL's assets on an *ex parte* basis. JA-730. In later reducing that amount following contested proceedings, the district court maintained a $3 million attachment that fully secured the gross amount of IT's costs award from the first arbitration. JA-731, 769. Thus, at all times prior to enforcing the costs award, the district court already had ensured that IT was fully secured for the amount of that award. Further, the parties' subsequent voluntary standstill agreement (pending IT's appeal of the district court's attachment decision) effectively increased the amount of that security to at least $28 million held in IBL's U.S. correspondent accounts. SPA-10-11. In those proceedings, IBL also did not cross-appeal the district court's decision to continue to attach $3 million held in IBL's correspondent accounts specifically to cover the costs award. The district court failed to explain why the continued attachment of $3 million held in IBL's correspondent accounts would not adequately protect IT's interests in receiving payment if IBL does not succeed in the annulment action in Lebanon.

Second, alongside the U.S. attachment, IBL had provided additional security to IT in the form of the "tender and deposit" payment in Lebanon, in the full gross amount of the costs award, well before the district court granted IT's petition to enforce the costs award. *See* JA-772-73. Still further, IBL reinforced its willingness and ability to provide adequate security to IT by obtaining a supersedeas bond to

secure IT's interests pending this appeal. JA-923-33. These forms of security—both before and after the enforcement decision—should have tilted the balance of hardships in IBL's favor, precisely as Article VI of the Convention envisions. *See Europcar*, 156 F.3d at 318 (noting Article VI permits "the party seeking enforcement" of the award to receive "suitable security" from the defendant).

The district court also failed to consider that IT was amply secured in yet a third way: through the Lebanese attachment order, which continues to attach all of IBL's property in Lebanon to secure the $3 million costs award. *See* JA-706. If IT ultimately prevails in the annulment action, the Lebanese attachment order ensures that it will be able to recover $3 million of IBL's assets in Lebanon to satisfy the costs award. Although the district court appeared skeptical that IT would be able to obtain "effective payment of the Award within Lebanon" due to "Lebanese capital controls" (SPA-20), that speculative assertion ignores the fact that IT, not IBL, initiated the Lebanese attachment proceedings and specifically sought to attach IBL's substantial property interests in Beirut in order to secure the costs award.

Finally, the district court fundamentally misconstrued the purpose of posting security under the fifth *Europcar* factor when it held that IBL's "precarious financial condition" raised a "genuine question of whether IBL will honor its obligations under the Award." SPA-20. The very point of requiring a party to post adequate security, or attaching a defendant's assets to secure a potential judgment, is to ensure

47

that external factors—such as the party's "precarious financial condition"—do <u>not</u> interfere with the plaintiff's ability to obtain payment at the conclusion of the litigation. For that reason, courts consistently hold the fifth factor favors a stay of enforcement when a party has posted adequate security, regardless of any broader concerns regarding the party's financial condition. *See, e.g.*, *Inversiones Samekh*, 2011 U.S. Dist. LEXIS 165787 at *12-13 (holding balance of hardships favored stay of enforcement because defendants' funds were secured "in escrow earning interest," despite broader "concerns about the stability of [Costa Rica's] financial system"); *Alto Mar*, 2005 U.S. Dist. LEXIS 7479 at *12 (holding defendants' posting of security favored stay of enforcement, despite plaintiffs' concerns regarding defendants' "distressed financial condition").

> **6.    The District Court's Failure to Properly Consider International Comity Concerns Weighs Heavily in Favor of Staying Enforcement.**

The sixth *Europcar* factor authorizes the court to consider "any other circumstances that could tend to shift the balance in favor of or against adjournment." *Europcar*, 156 F.3d at 318. The district court did not identify "any other circumstance" weighing against adjournment, but instead concluded—based on the first five factors—that IT "has met its burden of showing an entitlement to immediate confirmation of the Award." SPA-21. As the discussion above makes clear, however, the district court should have considered the significant comity

interests at stake in this case, given the parties' extensive efforts to contest the award in the Lebanese courts and Lebanon's strong interest in reviewing IT's claims made under Lebanese law against a major Lebanese bank.

In *Europcar*, this Court held that "a district court faced with a decision whether to adjourn arbitral enforcement … <u>must</u> take into account the inherent tension between competing concerns," including "the possibility of conflicting results and the consequent offense to international comity." 156 F.3d at 317 (emphasis added). "Neither a matter of legal obligation nor of mere courtesy, comity has long counseled courts to give effect, wherever possible, to the executive, legislative and judicial acts of a foreign sovereign …. In this vein, we have impliedly recognized the importance of comity when a case implicates public international issues and when prior steps in resolving a dispute have taken place in international fora." *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 371 (5th Cir. 2003).

Despite this instruction, the district court failed to mention—let alone defer to—Lebanon's interests in determining, in the first instance, the validity of an arbitration award rendered under Lebanese law, by an arbitral tribunal operating under the Rules of the Beirut Chamber, against a Lebanese bank that has already sought annulment of the award in Lebanon. Given the substantial steps that both parties have taken to resolve this dispute in Lebanon, the district court's failure to

assign any weight to international comity concerns is plainly both a violation of this Court's precedent, and an abuse of discretion.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order denying IBL's request to stay enforcement, and remand with instructions to stay further proceedings pending the resolution of IBL's annulment action in Lebanon.

Dated: July 27, 2022                    Respectfully submitted,

*Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
SQUIRE PATTON BOGGS (US) LLP
2550 M Street NW
Washington, D.C. 20037
(202) 626-6600

*Counsel for Respondent-Appellant IBL Bank S.A.L.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and Local Rule 32.1, the undersigned counsel certifies that:

1.    The foregoing brief complies with type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 12,041 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.


*Gassan A. Baloul*
Gassan A. Baloul

*Counsel for Respondent-Appellant IBL Bank S.A.L.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July, 2022, the foregoing document was filed with the Clerk of the Court and served upon counsel of record for Petitioner-Appellant via the Court's CM/ECF system.

*Gassan A. Baloul*
Gassan A. Baloul