# 22-832

## United States Court of Appeals
### *for the*
## Second Circuit

IRAQ TELECOM LIMITED,

*Petitioner-Appellee,*

v.

IBL BANK S.A.L.

*Respondent-Appellant.*

On Appeal From The United States District Court
For The Southern District Of New York, No. 21-cv-10940 (DLC)

## BRIEF FOR PETITIONER-APPELLEE

Kristin Tahler
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel.: 213-443-3000
Fax: 213-443-3100

Alex H. Loomis
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave, Ste. 520
Boston, MA 02199
Tel.: 617-712-7100
Fax: 617-712-7200

Derek L. Shaffer
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I St. NW, Ste. 900
Washington, DC 20005
Tel.: 202-538-8000
Fax: 202-538-8100

Kevin S. Reed
William B. Adams
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
Tel.: 212-849-7000
Fax: 212-849-7100

*Counsel for Petitioner-Appellee*

October 26, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, the undersigned counsel for Iraq Telecom Limited hereby states that the following are publicly held corporations that own 10% or more of its stock: Agility Public Warehousing Company K.S.C.P. and Orange S.A.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...............................................i

TABLE OF AUTHORITIES .......................................................iv

PRELIMINARY STATEMENT ....................................................1

STATEMENT OF THE ISSUES..................................................4

STATEMENT OF THE CASE..................................................4

I.    Factual Background ...................................................4

    A.    IBL's Fraud ...................................................5

    B.    Iraq Telecom Seeks Discovery Under Section 1782 ..........................7

    C.    An Arbitral Tribunal Issues A 240-Page Award Finding That IBL Defrauded Iraq Telecom ..............................8

    D.    Lebanon's Financial Crisis .........................................11

II.    Procedural Background ...............................................12

    A.    Iraq Telecom's Efforts To Enforce, And IBL's Action To Annul, The Award In Lebanon ..............................12

    B.    The District Court's Attachment Order...............................13

    C.    The District Court's Attachment Modification Order.......................14

    D.    This Court's Attachment Opinion ...................................16

    E.    IBL's Opposition To Enforcement Of The Award ...........................17

    F.    The Opinion Below ...............................................18

SUMMARY OF ARGUMENT ...................................................21

STANDARD OF REVIEW ......................................................25

ARGUMENT ...............................................................26

I.    The District Court Properly Exercised Its Discretion In Denying IBL's Request For A Stay ...............................................26

    A.    IBL's Lebanese Annulment Action Is Meritless (*Europcar* Factor 6).......................................................28

        1.    The District Court Properly Considered The Merits Of IBL's Annulment Arguments ..................................29

       2.      The District Court Properly Found, And IBL Never
               Disputed, That IBL's Annulment Action Is Meritless..............31

  B.    A Stay Would Have Unnecessarily Protracted This Dispute
       And Undermined The Objectives Of Arbitration (*Europcar*
       Factors 1-2)..........................................................................34

       1.      The District Court Properly Found That A Stay Would
               Impose An Unreasonable Delay ................................34

       2.      The District Court Was Not Required To Find That
               Comity Considerations Outweighed The Risks Of Delay ........37

       3.      The District Court Was Not Required To Engage In A
               Comparative-Delay Analysis ....................................40

  C.    IBL's Lebanese Action Appears To Have Been Brought Solely
       To Delay Enforcement (*Europcar* Factor 4)......................43

  D.    The Balance Of Hardships Favored Enforcement (*Europcar*
       Factor 5)..............................................................................46

  E.    The Award Will Not Receive Any Greater Scrutiny In Lebanon
       (*Europcar* Factor 3)...........................................................51

CONCLUSION ........................................................................................54

CERTIFICATE OF COMPLIANCE........................................................56

CERTIFICATE OF SERVICE .................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
139 F.3d 980 (2d Cir. 1998) ...................................................34

*Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*,
2005 WL 947126 (N.D. Ill. Apr. 12, 2005).............................51

*AOP Orphan Pharms. AG v. Pharmaessentia Corp.*,
2021 WL 2516103 (D. Mass. June 18, 2021) ..........................40

*Aperture Software GmbH v. Avocent Huntsville Corp.*,
2015 WL 12838967 (N.D. Ala. Jan. 5, 2015) ..........................36

*Beijing Shougang Mining Inv. Co. v. Mongolia*,
11 F.4th 144 (2d Cir. 2021) ................................ 19, 20, 26, 35

*Bennett v. Goord*,
343 F.3d 133 (2d Cir. 2003) ...................................... 4, 5, 6, 7

*Browe v. CTC Corp.*,
15 F.4th 175 (2d Cir. 2021) ....................................................30

*Clientron Corp. v. Devon IT, Inc.*,
2014 WL 940406 (E.D. Pa. Mar. 10, 2014) ....................... 38, 53

*Cline v. TouchTunes Music Corp.*,
765 F. App'x 488 (2d Cir. 2019).............................................26

*Commodities & Minerals Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*
49 F.4th 802 (2d Cir. 2022) .......................................................1

*Devas Multimedia Private Ltd. v. Antrix Corp.*,
2020 WL 5569782 (W.D. Wash. Sept. 17, 2020) ....................41

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
156 F.3d 310 (2d Cir. 1998) .......................................... passim

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*,
377 F.3d 1164 (11th Cir. 2004) ..............................................38

*G & G Prods. LLC v. Rusic*,
902 F.3d 940 (9th Cir. 2018) ..................................................33

iv

*G.E. Transp. S.P.A. v. Republic of Albania*,
    693 F. Supp. 2d 132 (D.D.C. 2010) ............................................................. 36, 40

*Gov't of Lao People's Democratic Republic v. Baldwin*,
    2022 WL 2340872 (D. Ida. June 29, 2022)................................................. 41, 52

*Hewlett-Packard Co. v. Berg*,
    61 F.3d 101 (1st Cir. 1995) ........................................................................... 39, 47

*Hulley Enters. Ltd. v. Russian Fed'n*,
    2022 WL 1102200 (D.D.C. Apr. 4, 2022) ...........................................................49

*Interdigital Commc'ns Corp. v. Samsung Elecs. Co., Ltd.*,
    528 F. Supp. 2d 340 (S.D.N.Y. 2007)....................................................... 36, 41, 42

*InterDigital Commc'ns, Inc. v. Huawei Inv. & Holding Co.*,
    166 F. Supp. 3d 463 (S.D.N.Y. 2016).................................................................36

*Inversiones Mercantiles S.A. v. Grupo Cementos*,
    2019 WL 8223562 (D. Colo. Mar. 25, 2019).....................................................42

*Inversiones Mercantiles, S.A. v. Grupo Cementos*,
    970 F.3d 1269 (10th Cir. 2020)............................................................. 38, 46, 53

*Inversiones Samekh, Sociedad Anonima v. Hot Springs Inv. LLC*,
    2011 WL 13221000 (S.D. Fla. Feb. 7, 2011).....................................................51

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
    43 F.4th 263 (2d Cir. 2022) ...................................................................... passim

*Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*,
    2005 WL 3533128 (W.D. Pa. Dec. 22, 2005)....................................................36

*Khalifeh v. Blom Bank SAL*
    [2021] EWHC 3399 (QB) ..................................................................................50

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas
    Bumi Negara*,
    500 F.3d 111 (2d Cir. 2007) ..............................................................................53

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas
    Bumi Negara*,
    335 F.3d 357 (5th Cir. 2003) ...................................................................... 38, 46

*Keepers, Inc. v. City of Milford*,
    776 F. App'x 734 (2d Cir. 2019).........................................................................26

*Ku v. U.S. Dep't of Hous. & Urban Dev.*,
    508 F. App'x 14 (2d Cir. 2013)............................................................26

*Libertarian Party of Connecticut v. Lamont*,
    977 F.3d 173 (2d Cir. 2020) ................................................ 30, 38, 48

*LLC SPC Stileks v. Republic of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021)..................................................... passim

*Manoukian v. Société Générale de Banque au Liban S.A.L.*,
    [2022] EWHC 669 (QB) ................................................ 12, 14, 15, 16

*MGM Prods. Grp., Inc. v. Aeroflot Russian Airlines*,
    573 F. Supp. 2d 772 (S.D.N.Y. 2003) ........................................ 41, 42

*Sci. Applications Int'l Corp. v. Hellenic Republic*,
    2017 WL 65821 (D.D.C. Jan. 5, 2017) ....................................... 35, 43

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
    592 F.3d 329 (2d Cir. 2010) .................................................................34

*Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic
    Republic*,
    864 F.3d 172 (2d Cir. 2017) .................................................................43

*Yukos Cap. S.A.R.L. v. Samaraneftegaz*,
    592 F. App'x 8 (2d Cir. 2014)...............................................................4

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
    126 F.3d 15 (2d Cir. 1997) ..................................................... 4, 26, 39

*ZF Automotive US, Inc. v. Luxshare, Ltd.*,
    142 S. Ct. 2078 (2022).........................................................................33

## Statutory Authorities

9 U.S.C. § 207 ........................................................................................26

28 U.S.C. § 1782 .......................................................................... 7, 9, 10, 11

## Rules and Regulations

Fed. R. Civ. P. 60(b)(5).................................................................... 23, 43

## Additional Authorities

Albert Jan van den Berg, *The New York Arbitration Convention of 1958:
    Towards a Uniform Judicial Interpretation* 267 (1981) ......................39

*Lebanese Pound Hits New Record Low Against the US Dollar, Al Arabiya*,
      https://english.alarabiya.net/business/economy/2022/10/17/Lebanese-
      pound-hits-new-record-low-against-the-US-dollar. (Oct. 17, 2022) ...................11

N. Homsi, *As Judges Join Strike for Better Pay and Conditions Ordinary
      Lebanese Suffer,* The National (Sept. 4, 2022).......................................................37

Restatement (Third) U.S. Law of Int'l Com. Arb. § 4.16.........................................32

## PRELIMINARY STATEMENT

This appeal arises from a final judgment from the U.S. District Court for the Southern District of New York (Cote, J.) enforcing a Lebanese arbitration award ("Award") under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, *implemented by* 9 U.S.C. §§ 201-208 ("New York Convention"). The Award awarded declaratory relief finding that Appellant IBL Bank S.A.L. ("IBL") had defrauded Appellee Iraq Telecom Limited ("Iraq Telecom"), and approximately $3 million in attorneys' fees. A Second Arbitration between the parties to determine Iraq Telecom's damages is currently pending. This Court has already held that Iraq Telecom is likely to be awarded at least $97 million in damages—Iraq Telecom's total losses resulting from IBL's fraud—in this Second Arbitration. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 276 (2d Cir. 2022).

A district court's review of a foreign arbitration award "is very limited in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Commodities & Minerals Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 809 (2d Cir. 2022) (omission, quotations, and citation omitted). Accordingly, district courts must enforce foreign arbitral awards absent the narrow grounds specified in Article V of the New York Convention.

1

In this appeal, IBL does not even argue that any New York Convention nonrecognition grounds apply.  Instead, IBL maintains that the district court abused its discretion in failing to stay enforcement of the Award pending resolution of an action it brought in Lebanon seeking to annul the Award.  While Article VI of the New York Convention gives a district court discretion to stay enforcement of awards pending resolution of a foreign annulment action "if it considers it proper," any argument that a district court abused its discretion by denying stay and ordering confirmation per the Convention faces a very high bar.

In pursuing this line of challenge, IBL has failed to meet the extraordinarily high burden it has assumed.  "[I]t is difficult to conceive of a greater delegation of discretion than" that granted to district courts under Article VI of the New York Convention.  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 880 (D.C. Cir. 2021).  This Court has set out a non-exhaustive list of factors, which other circuits have adopted, to guide district courts' discretion when considering stay requests under Article VI.  *See Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317-18 (2d Cir. 1998).  Tellingly, no court of appeals has ever held that a district court abused its discretion in applying these *Europcar* factors.

This Court should not be the first.  The district court properly considered all the *Europcar* factors and rightly denied a stay.  The district court's holding is true to

2

*Europcar*'s admonition that "[a] stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *Id.* at 317.

If anything, a stay would have been especially inappropriate here because the district court had ruled in an earlier stage of the proceedings that IBL's Lebanon annulment application was likely meritless under Lebanese law. Indeed, the court found that IBL's arguments were so weak that they "reinforce[d] the impression that IBL is simply seeking to delay the inevitable confirmation." SPA-19-20. In such circumstances, a stay would undermine the goals of arbitration, needlessly prolong this dispute, reward IBL for mounting a meritless challenge, and impose unnecessary hardship on Iraq Telecom by delaying and possibly foreclosing relief for its losses when IBL is likely insolvent (*Europcar* factors 1-4 and 6). It follows that the district court acted well within its discretion in denying IBL's request for a stay.

To argue the opposite, IBL largely resorts to faulting the district court for failing to consider arguments that IBL in fact never made below. Notably, IBL devoted only two-and-a-half pages to its stay request below, without offering any meaningful explication of the merits of its arguments for annulment.

IBL's only real argument on appeal, which it repeats for every *Europcar* factor, is that the Lebanese courts *might* annul the Award, and *if that happened*, it *might then* become proper for the district court to decline recognition to the Award. Of course, this is always true: for every Article VI stay request there is always a

3

possibility that a foreign annulment action might succeed. Yet a central purpose of the New York Convention was to "eradicat[e] the requirement that a court in the rendering state recognize an award before it could be taken and enforced abroad." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997). Reversing in this case, when no special circumstances favored a stay, would effectively require courts to grant Article VI stays whenever one is requested. That result would defy settled law, undermine the Convention, and make for bad policy.

This Court should affirm.

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion in denying IBL's request to stay enforcement of a foreign arbitral award under Article VI of the New York Convention, which states a court "may" stay enforcement "if it considers it proper."

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

The undisputed facts here are principally taken from the district court order enforcing the Award (SPA-1) and findings it derived from a prior order (JA-721), from the Award (JA-40), and from Iraq Telecom's verified petition to enforce the Award (JA-286). *See Yukos Cap. S.A.R.L. v. Samaraneftegaz*, 592 F. App'x 8, 11 (2d Cir. 2014) ("[C]ourts may not revisit or question the fact-finding … which produced the award." (internal quotations and citation omitted)); *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (treating "verified complaint" as "affidavit").

4

### A.    IBL's Fraud

Korek Telecom Company LLC ("Korek") is an Iraqi company that provides cell-phone services in Iraq.   JA-53.   Korek's sole shareholder is International Holdings Limited ("IHL"), a United Arab Emirates holding company, which is in turn owned primarily by Sirwan Saber Mustafa (also known as Barzani), a member of Iraqi Kurdistan's powerful Barzani family, through an intermediate entity.   SPA-3-4; JA-288.   Barzani also controls Korek as its managing director.   SPA-4.

In 2007, Korek—once a regional cellular services provider in the Kurdistan region of Iraq—acquired a license from the Iraqi government that permitted it to offer telecommunications services nationwide.   JA-53.   To obtain the license, Korek agreed to pay $1.25 billion in fees over multiple installments to the Iraqi government.   *Id.*   Korek sought and obtained financing both to pay the license fees and to fund an expansion of its operations.   *Id.*

Iraq Telecom, a joint venture formed by a Kuwaiti logistics company and a French telecommunications corporation, SPA-3; JA-723, provided the bulk of this investment.   JA-53-54.   Specifically, in 2011, Iraq Telecom invested more than $810 million into Korek, including a $285 million loan to Korek through IHL ("Iraq Telecom Loan").   SPA-4; JA-53-54.

Shortly thereafter, Korek urgently required additional funds to pay an installment of the license fee.   SPA-4.   For this purpose, Appellant IBL, a Lebanese

bank, offered Korek a $150 million loan ("IBL Loan"). SPA-4; JA-54-55, 724. But the loan offer was conditioned on Iraq Telecom agreeing to subordinate its own loan to the IBL Loan in the event of Korek's default ("Subordination Agreement"). SPA-4. Under the Subordination Agreement, upon default by Korek under the IBL Loan, Korek would cease all payments on the Iraq Telecom Loan for as long as Korek remained in default. *Id.*

To justify the subordination demand and obtain Iraq Telecom's approval, IBL, Korek, and Barzani all represented to Iraq Telecom that the IBL Loan was to be unsecured. *Id.*; JA-270-71. A day before the Subordination Agreement was to be signed, IBL sent Iraq Telecom the "final version" of the IBL Loan Agreement omitting any reference to the existence of any cash collateral. JA-264. In reliance on these representations, Iraq Telecom entered into the Subordination Agreement and approved what was represented as an uncollateralized IBL loan at an elevated 13.25% interest rate (to be elevated further to 15.25% upon any default by Korek). SPA-4.

Contrary to its representations to Iraq Telecom, IBL's loan to Korek was in fact fully secured with $155 million in cash collateral posted by Barzani. SPA-5. During the course of repayment, IBL secretly kicked back 96% of Korek's interest payments to Barzani, retaining 4% for itself. JA-266. IBL thus knowingly allowed

itself to be used by Barzani to siphon money out of Korek and profited from doing so. *Id.*

In 2015, Korek defaulted on both the Iraq Telecom Loan and the IBL Loan. SPA-5; JA-256. Instead of seizing Barzani's furtive collateral, IBL swiftly demanded full repayment and invoked the Subordination Agreement, thereafter denying Iraq Telecom any payments from Korek on the Iraq Telecom Loan. SPA-5. Since 2015 and the invocation of the Subordination Agreement, Korek has paid IBL over $148 million in interest while Iraq Telecom has received nothing. SPA-6 n.2; JA-306-07.[1] Absent the Subordination Agreement, the Iraq Telecom Loan would have been on equal footing—*pari passu*—with the IBL Loan at all times. SPA-4; JA-263. This Court has found in a prior appeal that this fraud likely "deprived" Iraq Telecom "of $97 million" total. *Iraq Telecom*, 43 F.4th at 275-76.

### B. Iraq Telecom Seeks Discovery Under Section 1782

In October 2018, Iraq Telecom filed an action under 28 U.S.C. § 1782 ("Section 1782") to obtain discovery from a number of IBL's New York correspondent banks after it had learned the IBL Loan may in fact have been secured. *See In re Ex Parte Application of Iraq Telecom Limited*, No. 18-mc-00458-LGS-

---

[1] This undisputed figure derives from the annual interest demanded by the IBL Loan and the Subordination Agreement—which was before the Arbitral Tribunal (JA-47)—in the event of default (JA-29) and the principal on the loan remaining at the time of default and understood to be remaining to this day (i.e., all $150 million).

OTW (S.D.N.Y.). The wire-transfer records obtained showed that "on December 20, 2011, the day before Korek entered into the IBL Loan, Mr. Barzani made a $155 million transfer from his account at HSBC in Dubai to an account in his name at IBL in Beirut, Lebanon." JA-301.

Iraq Telecom served IBL and a number of interested persons in November 2018 with an order to show cause from the court stating that they were "permitted … to intervene in this matter … to be heard in opposition to the Application." *In re Ex Parte Application of Iraq Telecom*, ECF 22-23. IBL did not intervene or oppose the Application.

### C.   An Arbitral Tribunal Issues A 240-Page Award Finding That IBL Defrauded Iraq Telecom

In June 2018, Iraq Telecom brought arbitration proceedings in Lebanon against IBL, Korek, and IHL ("Respondents"), seeking declaratory relief ("First Arbitration").[2] SPA-5. Iraq Telecom alleged that IBL, along with Korek and IHL, fraudulently induced Iraq Telecom into entering the Subordination Agreement. JA-112. Barzani was not a party to the First Arbitration. JA-49-52.

More than three years later, in September 2021, a distinguished Arbitral Tribunal issued a detailed, 240-page Award in Iraq Telecom's favor. SPA-6; JA-40.

---

[2]   Iraq Telecom originally sought money damages in the First Arbitration but, after confronting jurisdictional objections, narrowed the issues by amending its request to seek only declaratory relief while reserving the right to pursue money damages in a subsequent arbitration. SPA-5; JA-108, 236.

The Award found that IBL "deliberate[ly] and intentional[ly]" concealed the cash collateral to induce Iraq Telecom to agree to the Subordination Agreement, emphasizing that "in the banking practice, one would never subordinate [to] a loan which is fully collateralized." JA-264, 270. This plan was "carefully orchestrated," "[IBL] clearly and knowingly participated in the deception of [Iraq Telecom]," and IBL's "conduct … confirmed its engagement in *dol* [fraud] at the time of contract formation." JA-266, 271. The Arbitral Tribunal unanimously concluded that "each of the three Respondents actively participated in the commission of *dol* [fraud]" and "for the maneuver to succeed, it required the participation of all three Respondents." JA-270.

The Tribunal's findings rested on the Respondents' conduct up to and following the conclusion of the Subordination Agreement, taking into account, inter alia, the wire-transfer data obtained in Iraq Telecom's Section 1782 proceeding. JA-239. IBL had argued the evidence was inadmissible because Barzani as "the provider of the cash collateral" was entitled to "banking secrecy" under Lebanese law. JA-240. Korek and IHL also argued the evidence was inadmissible because it was not "obtained in a manner compliant with Section 1782." *Id.* The Tribunal rejected the Respondents' arguments, noting that the parties' Subordination Agreement stipulated that "the Tribunal may be guided by the [International Bar Association ("IBA")] Rules" on the Taking of Evidence in International Arbitration

("IBA Rules") and that those rules gave it complete authority to "determine the admissibility … of evidence" as well as any "legal impediment or privilege [to admissibility] … determined by the Arbitral Tribunal to be applicable." *Id.* (emphasis omitted) (second quoting IBA Rules art. 9.1; third quoting IBL Rules art. 9.2(b)). The Tribunal explained that the "Lebanese Law on Banking Secrecy expressly provides that it applies to banks established in Lebanon" and branches of foreign banks "operating in Lebanon," not U.S. banks like the one from which the discovery was obtained, and that the evidence "was validly obtained through legal means" in the United States. JA-241.

The Award declared the Subordination Agreement null and void. SPA-6; JA-284. Iraq Telecom was also awarded nearly $3 million in attorneys' fees plus 9% annualized interest against IBL, Korek, and IHL, jointly and severally. SPA-6 & n.1; JA-284. None have paid any amount of the Award. JA-289.

On December 13, 2021, after obtaining declaratory relief in the First Arbitration, Iraq Telecom initiated another (ongoing) arbitration in Lebanon, seeking damages against IBL resulting from its fraud ("Second Arbitration"). SPA-6; JA-290. In the Second Arbitration, Iraq Telecom is seeking damages at least in the amount of $97 million—its *pari-passu* share of the $148 million in payments Korek has made to IBL since the invocation of the now-void Subordination Agreement. SPA-6 & n.2; JA-290.

10

**D.** **Lebanon's Financial Crisis**

Further hampering Iraq Telecom's ability to recoup its losses, since 2019, Lebanon has been grappling with a financial and economic crisis. JA-308. The crisis was fueled in part by Lebanese banks running, in effect, a Ponzi scheme: banks would offer "high annual interest rates to anyone who deposited dollars," which in turn "required continuous new dollar deposits to make good on the promise to repay initial depositors." *Id.*

This has resulted in significant adverse consequences. Lebanon's "inflation rate … is among the highest globally." JA-309 (quotations and citation omitted). And the Lebanese Pound ("LBP") has been devalued significantly compared to the dollar. Lebanon's "official exchange rate … is currently approximately 1,500 LBP to $1," but the actual market exchange rate was 20,000 LBP to $1 in March 2022—over thirteen times higher than the "official rate" in Lebanon. JA-757 & n.19. As of the filing of this brief, the market exchange rate is reportedly 40,000 LBP to $1—twenty-six times the official rate. *See Lebanese Pound Hits New Record Low Against the US Dollar*, Al Arabiya (Oct. 17, 2022), https://perma.cc/DLD4-FWQ5.

"[I]n October 2019, Lebanon's banks imposed informal capital controls on financial outflows from Lebanon." JA-308. That is, Lebanon's government has not restricted financial outflows, but, as a matter of practice, "Lebanese banks do not permit" anyone to "transfer [USD] funds to overseas accounts." JA-810-11; *see* JA-

11

757; *Manoukian v. Société Générale de Banque au Liban S.A.L.*, [2022] EWHC 669 (QB) ¶ 25, https://perma.cc/ZGE7-FSD2. This has meant that "US dollar balances in accounts at Lebanese banks"—known as "lollars" (Lebanese dollars)—"are stranded," "cannot be converted into actual cash," and "are currently worth only a fraction of face value." JA-795-96.

One of the consequences of this financial fallout has been that "banker's checks denominated in foreign currency cannot be readily liquidated into cash at face value by the recipient" in Lebanon. SPA-9. For this reason, "[r]ecent decisions of Lebanese courts" have held that "payment by banker's cheque in Lebanon is no longer a viable means of payment to extinguish a debt denominated in foreign currency (including in USD)." JA-795.

Lebanon's financial crisis has also resulted in the widespread insolvency of its banks, likely including IBL. JA-309-10.

## II.    PROCEDURAL BACKGROUND

### A.    Iraq Telecom's Efforts To Enforce, And IBL's Action To Annul, The Award In Lebanon

On November 23, 2021, Iraq Telecom obtained an order from the Court of First Instance of Beirut giving the Award executory effect. JA-361.

On January 14, 2022, IBL filed an Annulment Application before the Court of Appeal of Beirut. JA-370. Specifically, IBL proposed that the following violated "a rule of international public policy": (1) the Tribunal's reliance on the Section

12

1782 wire-transfer records that "allegedly are confidential pursuant to Lebanese banking secrecy laws"; and (2) "the Tribunal's purported failure to disclose a prior business relationship between one of the Tribunal members and one of Iraq Telecom's shareholders." JA-372.

Iraq Telecom timely filed its response on February 23, 2022. JA-371.

Later, on March 10, 2022, the Head of the Beirut Execution Department—a judicial entity—issued an order granting Iraq Telecom's application to attach $2.832 million (less than the Award amount with interest) in IBL's assets to assist with securing the Award. JA-705; *see* SPA-8-9.

## B. The District Court's Attachment Order

On December 14, 2021, Iraq Telecom filed with the Southern District of New York a verified petition to enforce its $3 million Award and an *ex parte* motion for a $100 million attachment of all IBL funds in the United States. JA-286. This $100 million sum was equal to the approximately $3 million fee Award, plus the $97 million at least that Iraq Telecom expects to receive as damages in the Second Arbitration. JA-290. These papers were initially filed under seal to avoid alerting IBL of Iraq Telecom's attachment efforts. JA-3-4.

On January 19, 2022, the district court granted Iraq Telecom's motion ("Attachment Order"). JA-6. Iraq Telecom subsequently levied on approximately

$42 million in IBL's New York correspondent bank accounts. SPA-7. IBL had no other assets in the United States.

### C. The District Court's Attachment Modification Order

On March 16, 2022, the district court issued an opinion and order confirming but modifying its Attachment Order down from $100 million to just $3 million ("Attachment Modification Order"). JA-721. The Attachment Modification Order made several findings relevant to this appeal.

First, the court found that "Iraq Telecom has demonstrated that it is likely to succeed on its request to confirm the $3 million Award." JA-750. Conversely, it concluded that "IBL has not shown that it is likely to succeed" on either of its two arguments in the annulment action. *Id.*

Iraq Telecom had explained that IBL's first annulment argument—that the Tribunal erroneously admitted the Section 1782 evidence in violation of international public order—was unlikely to succeed on the merits. "IBL failed to assert in its Annulment Application any authorities showing that the admission of evidence obtained in separate proceedings by means of discovery is in breach of any rules of Lebanese international public policy," while Iraq Telecom cited authorities showing it is not. JA-373. Moreover, Iraq Telecom explained, "Lebanese banking secrecy laws do not apply to foreign banks." *Id.* Finally, "the annulment judge may only consider purported violations of international public policy that have impacted

the operative part of the Award" that "sets forth the Tribunal's [merits] determination." JA-372. "Here, the banking evidence was not determinative of the operative part of the Award." *Id.* The district court agreed with Iraq Telecom, ruling that IBL "has not shown that a Lebanese court will conclude that the panel was without authority to receive this evidence." JA-750-51.

Iraq Telecom further explained that IBL's second annulment argument—based on a purported conflict of interest—was meritless because "IBL did not raise any objections at the time of [the Tribunal member]'s disclosure" of the purported conflict and thus "expressly waived its right to object to the composition of the tribunal in the terms of reference of the First Arbitration." JA-373-74. The district court agreed with Iraq Telecom again, ruling that "[t]he member had disclosed the relationship giving rise to the claimed conflict and IBL waived the conflict." JA-751.

The court also concluded that "Iraq Telecom has shown that any arbitration award may be rendered ineffectual without a prejudgment attachment of IBL assets." JA-754. One reason was that "IBL is likely insolvent." *Id.* To make matters worse, IBL had suggested that it might, without the attachment, attempt to satisfy the Award "in Lebanon in an amount calculated at the official exchange rate in Lebanon." JA-757. This "could … deprive Iraq Telecom of the full benefit of the Award" because

15

Lebanon's official exchange rate is several-fold lower than the international exchange rate. *Id.* & n.19.

Notwithstanding its stated concerns about IBL's position, the court was generous to IBL in confirming only $3 million of the requested $100 million attachment. The court so limited its attachment based largely on concerns that the attachment could have "deleterious" knock-on effects "for the Lebanese economy," IBL's depositors, and the New York financial system. JA-759-60. It also found that Iraq Telecom had not shown that it was "likely to receive an award of $97 million against IBL in its pending arbitration," as it was "conceivable" that the Second Arbitration Tribunal would not hold IBL jointly and severally liable but instead limit its damages to the proceeds of the fraud that it did not pass on to Barzani but retained for itself. JA-751.

## D. This Court's Attachment Opinion

Iraq Telecom immediately appealed the Attachment Modification Order. On August 5, 2022, this Court vacated the Attachment Modification Order and remanded for the district court to consider whether an attachment of up to $42 million—the amount Iraq Telecom had previously levied on—was warranted. *See Iraq Telecom*, 43 F.4th at 276. As relevant here, this Court held that the district court erred in finding that Iraq Telecom had not established likelihood of success in the Second Arbitration. "The district court pointed to no provision of Lebanese law or

16

general tort principle that would allow a defendant who acted in concert with others to avoid joint and several liability merely because it did not retain all of the fraud proceeds." *Id.*

While the appeal was pending, the parties agreed to keep in place a $28 million freeze on IBL's New York correspondent accounts, D. Ct. ECF 124, "pending any subsequent contrary agreement of the parties or order of the District Court" on remand. D. Ct. ECF 141-1 at 2. That is the amount of the attachment that currently remains secured in the United States, while the parties on remand now brief their dispute over what the district court should order as the appropriate amount of the attachment following this Court's decision.

### E.    IBL's Opposition To Enforcement Of The Award

On March 25, 2022, while Iraq Telecom's prior appeal was pending, IBL filed its opposition to Iraq Telecom's petition to enforce the Award. D. Ct. ECF 117.

The bulk of IBL's brief was devoted to arguing that the Award was not yet final, and that the district court should not enforce the Award because IBL had already "paid" it in Lebanon—arguments it does not raise again on appeal. *Id.* at 6-8, 10-11. In so arguing, IBL relied upon its invocation of Lebanon's "tender-and-deposit" procedure, under which it presented Iraq Telecom with a banker's check to be drawn from IBL's account with Lebanon's central bank. SPA-9. In fact, a Lebanese tender-and-deposit is just "an offer to pay a debt." *Id.* A tender-and-

deposit offer "discharges the debt" *only* "*if* the creditor accepts the payment or if, upon application by the debtor, a court renders a judgment that the [tender-and-deposit] was adequate performance on the debt." *Id.* (emphasis added); *see* JA-793. "[N]either of those things has occurred" here. JA-793. "Upon receiving notice of [IBL's] [tender-and-deposit offer] on March 23, Iraq Telecom recorded its refusal to accept the check on the notification slip and in a separate letter to IBL demanded payment by international bank transfer," as was its right. SPA-10; *see* D. Ct. ECF 121 at 3-4. IBL did not "commence[] a judicial action to validate the tender and deposit" within ten days of Iraq Telecom's refusal, as required by Lebanese law to overcome the refusal. JA-794. IBL's briefing below omitted to disclose these key facts.

Finally, IBL asked the court "[i]n the alternative" to stay the proceeding pending the conclusion of its annulment action in Lebanon under Article VI of the New York Convention. D. Ct. ECF 117 at 8. IBL devoted less than two-and-a-half pages to this argument. *Id.* at 8-10.

### F. The Opinion Below

The district court entered an opinion and order enforcing the Award on April 8, 2022, finding that the Award had not in fact been paid, and declining IBL's request for a stay. SPA-1. In denying IBL's stay request, the district court found that "[t]he balance of the *Europcar* factors weigh strongly against a stay, and IBL has identified

18

no other factors that warrant a stay" pending resolution of its annulment action. SPA-21; *see* SPA-18-21.

First, the court found that "the first and second [*Europcar*] factors weigh in favor of immediate confirmation." SPA-19. As to the first factor, the court noted that "[t]he twin goals of arbitration, 'settling disputes efficiently and avoiding long and expensive litigation,' favor expeditious execution of the Award." *Id.* (quoting *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 160 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2889 (2022)). In this regard, the court found significant that the "lengthy, detailed" Award "was entered after three years of proceedings before the Tribunal," and that "[f]urther delays to await the resolution of the annulment action, which is in its earliest stage, would only protract this long-running and contentious dispute." *Id.* As to the second factor, the court pointed out that "IBL has not provided any reliable estimate, or even any estimate, of how long its action to set aside the Award may take." *Id.*

Second, the court found that "[t]he fourth [*Europcar*] factor also counsels against a delay in confirmation." *Id.* The court noted that "IBL has not acted with alacrity to challenge the Award in Lebanon," "wait[ing] to commence its action to set aside the Award for roughly four months after the Award was issued and for almost two months after Iraq Telecom obtained executory effect for the Award from a Lebanese court." *Id.* The court also pointed to "the weakness of [IBL's] arguments

19

in the annulment action." *Id.* Collectively, this "reinforce[d] the impression that IBL is simply seeking to delay the inevitable confirmation." SPA-19-20.

Third, the court found that the fifth *Europcar* factor—"[t]he balance of hardships"—"also weighs against IBL's request." SPA-20. On the one hand, "Iraq Telecom has acted diligently in the United States and Lebanon to enforce the Award," but "will have difficulty obtaining effective payment of the Award within Lebanon and must rely on … enforcement outside Lebanon" "[b]ecause of Lebanese capital controls," and there is also "a genuine question of whether IBL will honor its obligations under the Award" "[b]ecause of IBL's precarious financial condition." *Id.* "IBL, on the other hand, has not identified any hardship that it will encounter." *Id.*

Finally, the court found that "[o]nly the third *Europcar* factor supports a delay in confirmation, and then only slightly." *Id.* The court operated on the "assumption" that, "[a]s the primary jurisdiction, a Lebanese court in an annulment action may be able to rely on a broader range of grounds to vacate the Award than the seven defenses contained in the Convention," even though "[t]he parties dispute whether that is so." *Id.* But the court explained why it discounted this factor: "Even on the assumption that a Lebanese court will have more leeway to vacate the Award, IBL has not shown that that additional authority will be of benefit to it," because IBL "has not shown that it is likely to succeed on either of the two grounds on which it

20

relies in its annulment proceeding" and "neither appears to be meritorious." SPA-16, 20-21 (citing JA-750-51).

The court entered final judgment on April 15, 2022. SPA-24. This appeal followed.

## SUMMARY OF ARGUMENT

Article VI of the New York Convention gives district courts substantial discretion over whether to stay an enforcement action pending a foreign annulment action. This Court's opinion in *Europcar*, 156 F.3d 310, encouraged district courts to consider several non-exhaustive factors when deciding whether to grant such a stay request. The district court properly considered each *Europcar* factor below en route to denying IBL's request for a stay. IBL largely fails to address the district court's stated justifications, makes new arguments on appeal that were never raised below, and ultimately falls far short of showing that the district court abused its discretion.

**A.** The district court properly ruled that IBL's annulment action in Lebanon was unlikely to succeed on the merits. Iraq Telecom had presented a persuasive and unrebutted foreign-law declaration attesting why IBL's two grounds for annulment were meritless, and the district court agreed. Because IBL did not challenge that preliminary ruling when seeking a stay, the district court naturally found that this factor favored immediate enforcement. Considering that a party

21

requesting an Article VI stay must show "a fair probability," if not a "high probability," that its annulment challenge will actually succeed, Iraq Telecom's total lack of proof on this point leaves the district court's resolution beyond reproach. *Stileks*, 985 F.3d at 881.

Setting aside IBL's failure to make the necessary showing below, the district court's ruling was correct on the legal merits. IBL's first argument for annulment is that the Tribunal violated international public order by considering evidence obtained via a Section 1782 proceeding. This argument is unlikely to succeed because (1) the Tribunal had complete discretion to admit any evidence it considered appropriate, (2) preliminary evidentiary rulings that are not part of the operative part of the Award are not subject to challenge in Lebanon, and (3) evidentiary rulings cannot violate international public order. IBL's only other argument for annulment is that a member of the Tribunal had a purported conflict of interest. The district court rightly rejected this argument too, as the Tribunal member had disclosed the purported conflict to IBL in advance, and IBL waived it.

**B.** The district court properly ruled that a stay would unduly delay the litigation and undermine the purposes of arbitration. The Award was entered after several years of proceedings, and further delay pending the annulment action would be unfair to Iraq Telecom. IBL cannot even estimate when the annulment action will likely conclude. Courts frequently deny stays in these circumstances.

IBL responds that the court should have granted a stay for comity reasons to avoid the risk of conflicting results if its annulment application is granted, but this unpersuasive.  IBL did not make this argument (or even use the word "comity") in its brief below, so it has forfeited the argument.  Nor does comity require abstention merely because there is a parallel foreign proceeding.  Rather, the *Europcar* factors properly balance such comity interests against the purposes of the New York Convention.  And the Convention was designed specifically to allow for enforcement actions to proceed around the world before annulment actions are completed.  Finally, there is little risk to comity here because IBL is likely to lose in Lebanon, as explained above.

IBL also claims that the court should have compared the delay caused by a stay to the delay that could result if its Lebanon annulment action succeeds.  Again, IBL did not make this argument below, and IBL's Lebanon annulment action is unlikely to succeed.  In any event, this comparative-delay analysis is extraneous: no court of appeals has endorsed it, and many courts eschew it.  Finally, no comparative delay will result from enforcing the Award now.  If IBL succeeds in the annulment action, it can simply move to vacate the final judgment below under Federal Rule of Civil Procedure 60(b)(5).

**C.**  The district court properly found that the circumstances surrounding IBL's annulment action—including that it delayed in bringing the action, did so only

in response to Iraq Telecom's enforcement efforts, and made only weak arguments in Lebanon—further weighed in favor of enforcement. Without engaging the court's analysis, IBL argues that, in effect, Iraq Telecom waived the right to enforce the Award in the United States before completion of IBL's annulment action simply because Iraq Telecom had first sought to enforce the Award in Lebanon. Not so. The New York Convention specifically contemplates that parties should be able to engage in simultaneous enforcement efforts around the world.

**D.** The district court properly found that the balance of hardships favored enforcement rather than a stay. IBL does not dispute that immediate enforcement poses no harm to it. By contrast, a stay would cause Iraq Telecom substantial hardship because IBL is likely insolvent, and Iraq Telecom is unlikely to recover the full extent of the damages expected to be owed by IBL. IBL responds that Iraq Telecom's interests are adequately secured by the $28 million attachment currently in place in the United States, but that is untrue. Iraq Telecom's attachment secures only a fraction of Iraq Telecom's likely award in excess of $97 million in the Second Arbitration and leaves at the very least a $72 million shortfall. This is inadequate security for the First Arbitration Award.

**E.** The district court found that only one factor weighed in favor of a stay, and even then "only slightly": that Lebanon, as the country where the award was rendered, *might* review the Award with greater scrutiny than a U.S. court. SPA-20.

This did not outweigh all the other *Europcar* factors, however, because IBL had not shown it was likely to succeed in the annulment action.

If anything, the district court's ruling was generous to IBL, as IBL did not show that a Lebanese court would review the Award with greater scrutiny than a U.S. court. Lebanon is a pro-arbitration jurisdiction, with limited grounds for annulment, and Lebanese courts apply a high threshold for annulment applications. What is more, IBL did not invoke domestic, Lebanese grounds for annulment, but instead invoked "international public order." This is no different than the New York Convention's Article V defense to recognition on "public policy" grounds that any U.S. court could invoke—a high bar, and one that rarely results in nonenforcement.

For all these reasons, the district court did not come close to abusing its discretion when it denied a stay.

## STANDARD OF REVIEW

The New York Convention accords considerable discretion to district courts weighing a request to stay enforcement of an arbitral award: the court "may" stay enforcement "if it considers it proper." N.Y. Convention art. VI. This Court thus reviews "a district court's decision whether to adjourn" pending a foreign annulment action "for abuse of discretion." *Europcar*, 156 F.3d at 317. This "highly deferential standard" is met "only if (1) the court's decision rests on an error of law … or clearly erroneous factual finding, or (2) its decision … cannot be located within the range

of permissible decisions." *Cline v. TouchTunes Music Corp.*, 765 F. App'x 488, 492 (2d Cir. 2019) (internal quotations and citation omitted).

This Court may "affirm the district court decision on any grounds for which there is a basis in the record," including grounds the district court did not expressly rely on. *Ku v. U.S. Dep't of Hous. & Urban Dev.*, 508 F. App'x 14, 16 (2d Cir. 2013); *see, e.g.*, *Keepers, Inc. v. City of Milford*, 776 F. App'x 734, 735 (2d Cir. 2019).

"[A] party seeking to avoid summary confirmation of an arbitral award … has the burden of proof." *Beijing Shougang Mining*, 11 F.4th at 160.

## ARGUMENT

## I.   THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING IBL'S REQUEST FOR A STAY

"Under the [New York] Convention, the district court's role in reviewing a foreign arbitral award is strictly limited: 'The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" *Yusuf Ahmed Alghanim*, 126 F.3d at 19 (quoting 9 U.S.C. § 207).

This rule is subject to only one exception.  If a party has sought to annul the award in the country in which, or under the law of which, that award was made, Article VI of the New York Convention provides that a district court "may, if it considers it proper, adjourn the decision on the enforcement of the award."  Article

VI affords district courts substantial discretion in deciding to grant or deny stays. Indeed, "it is difficult to conceive of a greater delegation of discretion than 'if [the court] considers it proper.'" *Stileks*, 985 F.3d at 880 (alteration in original) (quoting N.Y. Convention art. VI). But "[a] stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *Europcar*, 156 F.3d at 317.

This Court has encouraged district courts "to consider several [nonexclusive] factors" when deciding whether to stay a New York Convention enforcement action pending foreign annulment proceedings. *Id.* These factors include: "(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation; (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved; (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review; (4) the characteristics of the foreign proceedings … ; (5) a balance of the possible hardships to each of the parties … ; and (6) any other circumstances that could tend to shift the balance in favor of or against adjournment." *Id.* at 317-18. These *Europcar* factors are "not an exhaustive list," and "the first and second factors on the list should weigh more heavily" "[b]ecause the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards." *Id.* at 318.

27

Courts nationwide have endorsed *Europcar* to varying degrees. Since *Europcar*, however, no court of appeals has ever ruled that a district court misapplied these factors to the point of abusing its discretion. Every circuit has instead affirmed recognition, emphasizing that a district court's application of the *Europcar* factors falls within "a district court's general discretion in managing its own caseload and suspense docket." *Stileks*, 985 F.3d at 879 (quoting *Europcar*, 156 F.3d at 316). Thus, "a district court would abuse its discretion if it failed to consider the first and second factors," but not necessarily if it failed to consider the other non-exhaustive list of factors. *Id.* at 880 (citing *Europcar*).

This Court should not be the first to reverse a district court's application of *Europcar*'s highly discretionary factors. Before ruling on IBL's stay request, the district court had found, after briefing by both parties, that IBL's arguments in the Lebanese proceeding were meritless. The district court then properly weighed each *Europcar* factor. IBL's arguments on appeal largely ignore the district court's findings and make arguments that IBL never made below. By no means has IBL shown that the district court abused its discretion.

## A. IBL's Lebanese Annulment Action Is Meritless (*Europcar* Factor 6)

*Europcar* encourages district courts to consider "any … circumstances that could tend to shift the balance in favor of or against adjournment." 156 F.3d at 318.

28

The district court here did just that when it examined the merits of IBL's annulment arguments and found them wanting.[3]

### 1. The District Court Properly Considered The Merits Of IBL's Annulment Arguments

IBL's opening brief omits that, before IBL sought a stay, the district court had already ruled that IBL's annulment arguments were meritless, and IBL never challenged that ruling. JA-721. Before enforcing the Award, Iraq Telecom sought an attachment of IBL's assets. IBL opposed Iraq Telecom's request for attachment, arguing that Iraq Telecom was unlikely to succeed on the merits of its enforcement action because the Award could be rendered unenforceable by its Lebanese annulment action. D. Ct. ECF 94 at 21. Iraq Telecom responded that IBL's arguments in the annulment action were meritless and thus likely to fail. D. Ct. ECF 99 at 14-16. In reply, IBL did not address Iraq Telecom's arguments. D. Ct. ECF 104 at 10.

The district court agreed with Iraq Telecom, ruling that "IBL has not shown that it is likely to succeed" in its "annulment action." JA-750; *see* JA-750-51. Iraq Telecom relied on this ruling when opposing IBL's stay request, pointing out that IBL had not challenged "this Court's prior findings or Iraq Telecom's arguments that its annulment action is meritless and unlikely to succeed." D. Ct. ECF 121 at 1.

---

[3] Iraq Telecom addresses the *Europcar* factors in the same order that the district did, beginning with its prior ruling on the merits of IBL's arguments.

The district court agreed, again concluding that "neither [of IBL's annulment grounds] appears to be meritorious."  SPA-16 (citing JA-750-51).

IBL is thus wrong when it claims (Br. 38) that "[t]he district court did not analyze any of the grounds presented in IBL's motion to annul."  The district court *did* address those grounds when *rejecting* them.  Having failed to challenge the court's findings below, IBL cannot challenge them for the first time on appeal (or in reply).  *See, e.g.*, *Libertarian Party of Connecticut v. Lamont*, 977 F.3d 173, 181 n.3 (2d Cir. 2020) ("[A]n appellate court will not consider an issue raised for the first time on appeal." (quotations and citation omitted)); *Browe v. CTC Corp.*, 15 F.4th 175, 191 (2d Cir. 2021) ("[A]rguments may not be made for the first time in a reply brief." (alteration, quotations, and citation omitted)).

IBL's failure to defend its annulment arguments (implausible on their face) weighs decidedly against a stay.  The D.C. Circuit has even suggested that likelihood of success in the annulment action should be a primary consideration, holding that a party requesting a stay must show at minimum "a fair probability," if not a "high probability," that the annulment challenge will actually succeed.  *Stileks*, 985 F.3d at 881.  Leading international commentary on the New York Convention likewise agrees that courts should not "adjourn enforcement of the award" under Article VI when the "annulment proceedings" lack "good faith" and are being used "as a delay tactic."  Marike R.P. Paulsson, *The 1958 New York Convention in Action* 213 (2016).

As such, the district court properly concluded that the weakness of IBL's annulment arguments "reinforce[s] the impression that IBL" commenced its annulment action "simply [] to delay the inevitable confirmation." SPA-19-20.

### 2. The District Court Properly Found, And IBL Never Disputed, That IBL's Annulment Action Is Meritless

The district court was also correct in finding that IBL's annulment arguments had no likelihood of success on the merits.

***The Evidentiary Challenge:*** IBL's first annulment argument is that the Tribunal, by considering bank-record evidence from the Section 1782 action, violated "international public order" because (1) Section 1782 does not allow for discovery in aid of arbitration, and (2) the discovery was protected by Lebanese banking secrecy laws. JA-339, 344. But IBL forfeited any objection to Section 1782 discovery when it declined to intervene in that proceeding despite having been given notice. It cannot now collaterally attack the Award on this basis.

IBL's argument is also meritless, as both the Tribunal and the district court concluded. The Tribunal found that the agreed-upon arbitral rules gave it complete discretion to admit any evidence it received. JA-240. The Tribunal chose to consider the Section 1782 evidence because the discovery "was validly obtained through legal means" from a U.S. bank not subject to Lebanese banking-secrecy laws. JA-241. Moreover, IBL cannot challenge the Tribunal's evidentiary rulings because, in Lebanon, parties may challenge only the "operative" part of the Award

that "sets forth the Tribunal's [merits] determination," and this evidentiary ruling was not in the operative part of the Award. JA-372.

Iraq Telecom also showed, through an unrebutted foreign-law declaration, that admitting discovery authorized by a U.S. court would not violate international public order under Lebanese law. JA-373 & n.6. The "international public order" defense IBL invokes in Lebanon is akin to the New York Convention's "public policy" defense, and is similarly construed extremely narrowly. It encompasses only "(i) fundamental principles, pertaining to justice or morality, that the State wishes to protect even when it is not directly concerned; (ii) rules designed to serve the essential political, social or economic interests of the State … ; and (iii) the duty of the State to respect its obligations towards other States or international organisations." Pierre Mayer & Audrey Sheppard, *Final ILA Report on Public Policy as a Bar to Enforcement of International Arbitral Awards*, 19 Arb. Int'l 249, 255 (2003). It does not encompass challenges to "procedural, evidentiary, or discovery practices." Restatement (Third) U.S. Law of Int'l Com. Arb. § 4.16 cmt. b (Prelim. Final Draft 2019); *see also* Gary B. Born, *International Commercial Arbitration* 3611-13 (3d ed.) (Jan. 2021) (explaining that this ground can be "invoked only in cases of clear violations of fundamental, mandatory legal rules, not in cases of judicial disagreement with an arbitral tribunal's substantive decisions or procedural rulings").

IBL did not respond to these arguments below, either in the attachment proceedings or when requesting a stay. "[I]t is neither novel nor remarkable for a court to accept the uncontradicted testimony of an expert to establish the relevant foreign law." *G & G Prods. LLC v. Rusic*, 902 F.3d 940, 951 (9th Cir. 2018) (internal quotations and citation omitted). As such, the district court properly ruled that IBL "ha[d] not shown that a Lebanese court will conclude that the panel was without authority to receive this evidence." JA-750-51.

Contrary to IBL's assertions (Br. 2), the Supreme Court's holding in *ZF Automotive US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078 (2022), does not "validate[]" IBL's annulment argument. *ZF Automotive* holds merely that Section 1782 does not authorize discovery in aid of commercial arbitration in cases going forward. It did not rule or even suggest, as IBL must show in Lebanon, (1) that arbitral awards relying on such discovery must be set aside as contrary to international public order, (2) that the Tribunal lacked discretion over the decision to admit such evidence, and (3) that IBL can challenge rulings that are not in the "operative" part of the Award. Simply put, this development does not move the needle for IBL's annulment action.

***The Conflict Of Interest Challenge:*** IBL's only other argument in Lebanon is that a member of the arbitration panel had a purported conflict of interest. JA-348. The district court found that this argument lacked merit because "[t]he member had disclosed the relationship giving rise to the claimed conflict and IBL waived the

33

conflict." JA-751. This ruling was correct. "Where a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that ground." *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998) (quotations and citation omitted). IBL did not challenge this ruling below, does not challenge it on appeal, and cannot claim on reply that this (doubly) forfeited argument has merit. *See, e.g.*, *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 346 n.10 (2d Cir. 2010).

### B. A Stay Would Have Unnecessarily Protracted This Dispute And Undermined The Objectives Of Arbitration (*Europcar* Factors 1-2)

#### 1. The District Court Properly Found That A Stay Would Impose An Unreasonable Delay

The first *Europcar* factor courts should consider is "the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation." 156 F.3d at 317. The second *Europcar* factor is "the status of the foreign proceedings and the estimated time for those proceedings to be resolved." *Id.* Courts often consider these two factors together, as staying a case pending resolution of an extended annulment proceeding would undermine the expeditious resolution of disputes. *See, e.g.*, *Sci. Applications Int'l Corp. v. Hellenic Republic*, 2017 WL 65821, at *2-3 (D.D.C. Jan. 5, 2017).

The district court properly found that the first two *Europcar* factors favored immediate enforcement. "The Award was entered after three years of proceedings before the Tribunal and is supported by the Tribunal's lengthy, detailed findings of fact and law." SPA-19. "The twin goals of arbitration, 'settling disputes efficiently and avoiding long and expensive litigation,' favor expeditious execution of the Award." *Id.* (quoting *Beijing Shougang Mining*, 11 F.4th at 160). "Further delays to await the resolution of the annulment action, which is in its earliest stage, would only protract this long-running and contentious dispute." *Id.*

IBL does not identify an abuse of discretion anywhere in the district court's analysis. IBL does not dispute that a stay would result in obvious delay pending resolution of the Lebanese annulment action, when the arbitration proceeding had already taken more than three years, and there are still pending proceedings for damages. It was reasonable for the district court to find this additional delay unwarranted and undesirable. The D.C. Circuit has held that it would be improper to force a litigant that commenced arbitration "more than 10 years ago … to sit on its award for several additional years." *Stileks*, 985 F.3d at 880. Here, the fraudulently-induced contract at the heart of the arbitration was entered into more than ten years ago, arbitration commenced more than four years ago, and there is no end in sight nor any alacrity to IBL's legal challenges in Lebanon. Other courts have found that a "five to eight month[]" delay caused by annulment proceedings

"overwhelmingly weighs against adjourning enforcement of the Award." *Interdigital Commc'ns Corp. v. Samsung Elecs. Co., Ltd.*, 528 F. Supp. 2d 340, 361 (S.D.N.Y. 2007) (Sullivan, J.); *see also, e.g.*, *G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 139 (D.D.C. 2010) ("[T]he first *Europcar* factor plainly weighs in favor of confirmation" because "petitioners have yet to receive any satisfaction, nearly four years after commencing arbitration").

What is more, unlike in many of the (generally out-of-circuit and unpublished) cases IBL relies on (Br. 29-31), here "IBL has not provided any reliable estimate, or even any estimate, of how long its action to set aside the Award may take." SPA-19; *compare InterDigital Commc'ns, Inc. v. Huawei Inv. & Holding Co.*, 166 F. Supp. 3d 463, 471 (S.D.N.Y. 2016) (finding that the annulment proceedings would conclude within a few months); *Aperture Software GmbH v. Avocent Huntsville Corp.*, 2015 WL 12838967, at *6 (N.D. Ala. Jan. 5, 2015) ("[T]he lower court's decision will only take three to six months from the hearing"); *Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, 2005 WL 3533128, at *3 (W.D. Pa. Dec. 22, 2005) (French annulment proceedings will conclude "before the end of next year"). IBL merely says (Br. 35) that "Lebanese courts are functioning normally" but does not clarify whether that means the annulment action, pending since January 2022, and any appeals from it should be expected to conclude in five weeks, five months, or five years. JA-370.

36

Finally, it is not even clear that Lebanese courts are functioning normally. Many Lebanese judges have in recent weeks gone on strike to demand better wages and working conditions, which has resulted in many cases being suspended. *See, e.g.*, N. Homsi, *As Judges Join Strike for Better Pay and Conditions Ordinary Lebanese Suffer*, The National (Sept. 4, 2022), https://perma.cc/D8X7-XL79 ("Some courts are completely closed" and "the judicial process was barely moving even before the strike," as courts have been supplied with only "a few hours of power a day"). There simply is no telling how long IBL's annulment action will last.

### 2. The District Court Was Not Required To Find That Comity Considerations Outweighed The Risks Of Delay

IBL claims (Br. 33-34) that the district court should have "stay[ed] enforcement of the award as a matter of comity" to avoid "the risk of conflicting results" in case the Lebanese court annuls the Award (second internal quotations and citation omitted). IBL later invokes (Br. 48-50) comity as an independent *Europcar* factor. This argument is unpersuasive for four reasons.

*First*, IBL never made this argument below; the word "comity" does not even appear in IBL's brief before the district court. *See* D. Ct. ECF 117. The district court was not obligated to afford greater treatment to an argument that IBL never even made to it. *See, e.g.*, *Lamont*, 977 F.3d at 181 n.3.

*Second*, comity does not *require* courts to suspend their exercise of jurisdiction whenever there is a pending, parallel action abroad that could,

potentially, produce conflicting results. "A court action in the country where the arbitration took place does not create a defense to confirmation." *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1298 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 2793 (2021). District courts enforce arbitral awards under the New York Convention "even when nullification proceedings"—like IBL's annulment application—"are occurring in the country where the award was rendered." *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 367 (5th Cir. 2003). Comity does not always prevail because "it is the policy of the United States to facilitate the resolution of disputes through arbitration," and "[t]his policy is even stronger in the international context." *Clientron Corp. v. Devon IT, Inc.*, 2014 WL 940406, at *5 (E.D. Pa. Mar. 10, 2014). Indeed, the very purpose of the *Europcar* factors is to "balance the Convention's policy favoring confirmation of arbitral awards against the principle of international comity." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 (11th Cir. 2004); *see Stileks*, 985 F.3d at 880 (same).

IBL's bid (Br. 49) to elevate "Lebanon's interests in determining, in the first instance, the validity of an arbitration award" issued in Lebanon threatens to undermine "[a] central purpose of the [New York] Convention," which is "to expedite the recognition of foreign arbitral awards with a minimum of judicial

interference." *Hewlett-Packard Co. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995). The New York Convention was written to "succeed[] and replace[]" the Geneva Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301 ("Geneva Convention"), specifically because the Geneva Convention "required an award first to be recognized in the rendering state before it could be enforced abroad, the so-called requirement of 'double exequatur'"—"an unnecessary time-consuming hurdle." *Yusuf Ahmed Alghanim*, 126 F.3d at 22 (internal citation omitted) (third quoting Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 267 (1981)). The New York Convention "eliminated this problem by eradicating the requirement that a court in the rendering state recognize an award before it could be taken and enforced abroad." *Id.* Having ratified this treaty, Lebanon should not be aggrieved by the resulting regime. Nor has Lebanon in any way objected to the district court's enforcement of the Award.

*Third*, there is minimal risk of offending international comity by enforcing the Award here. Again, IBL's annulment action is unlikely to succeed, *supra* Section A, and courts deny Article VI stays when "the risk of inconsistent judgments is low." *AOP Orphan Pharms. AG v. Pharmaessentia Corp.*, 2021 WL 2516103, at *3 (D. Mass. June 18, 2021). Unlike in the cases IBL relies on (*see* Br. 35-36), Lebanese courts have already authorized the attachment of IBL's assets, notwithstanding

IBL's annulment action, so it defies reason to suppose they would be offended by the district court enforcing the Award itself. JA-705. "IBL's filing of the annulment action" may have "*automatically* suspended enforcement" under Lebanese law (Br. 35) (emphasis added). But automatic suspension of award enforcement pending annulment challenges is common in civil-law countries, not an unusual circumstance favoring a stay. *See, e.g.*, van den Berg, *supra*, at 352. To stay arbitral awards that were issued in all such countries as a matter of course would undermine the New York Convention by making those countries' arbitral awards harder to enforce. And to stay so reflexively would be especially misconceived in a case where no Lebanese court has chosen to "set aside the Arbitral Award on an interim basis." *G.E. Transp.*, 693 F. Supp. 2d at 139. At a minimum, a district court does not abuse its discretion by treating a stay as less-than-automatic in this circumstance and denying it upon considering all the relevant factors.

### 3. The District Court Was Not Required To Engage In A Comparative-Delay Analysis

IBL also contends (Br. 29, 32) that the district court abused its discretion because it failed to "consider whether the immediate delay" from a stay "was likely to exceed the potential delay that would arise if the Lebanese court ultimately annuls the award." This is unpersuasive for four reasons.

*First*, IBL did not preserve this argument below. It did not contend that courts should engage in the comparative-delay analysis it endorses here but merely asserted

40

that the Lebanese decision on its annulment application "will inevitably inform the enforcement determinations of this Court"—nothing more.  D. Ct. ECF 117 at 9.

*Second*, IBL made no showing that annulment is at all likely, so any such delay it raises is nothing more than "speculative," at best.  *Gov't of Lao People's Democratic Republic v. Baldwin*, 2022 WL 2340872, at *4 (D. Ida. June 29, 2022); *see, e.g.*, *Devas Multimedia Private Ltd. v. Antrix Corp.*, 2020 WL 5569782, at *3 (W.D. Wash. Sept. 17, 2020) ("[T]here is no question that lifting the stay will further the general objectives of arbitration … if … Respondent's set-aside petition pending in Indian courts lacks merit." (internal quotations and citation omitted)).

*Third*, courts are not required to conduct this comparative-delay analysis. *Europcar* did not endorse it.  *See* 156 F.3d at 317-18.  Neither has the D.C. Circuit when applying *Europcar*.  *See Stileks*, 985 F.3d at 880-81 (focusing exclusively on the delay caused by a stay).  A string of district court judges have dispensed with any such comparative analysis.  *See Interdigital Communications*, 528 F. Supp. 2d at 360-61 (Sullivan, J.) (the fact that "adjourning enforcement" would cause further delays "overwhelmingly favor[s] enforcement of the Award"); *see also, e.g.*, *MGM Prods. Grp., Inc. v. Aeroflot Russian Airlines*, 573 F. Supp. 2d 772, 778 (S.D.N.Y. 2003); *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua, S.A.B. de C.V.*, 2019 WL 8223562, at *13-14 (D. Colo. Mar. 25, 2019) (looking only to the delay caused by the adjournment).

Notably, some of IBL's own cited cases do not endorse this comparative-delay analysis. At least a few of the cases IBL cites were less concerned with enforcing an award that is later annulled, and more concerned with the "duplication and delay" in hearing merits challenges to the award in New York when similar challenges were being heard abroad. *E.g.*, *InterDigital*, 166 F. Supp. 3d at 472. By contrast, IBL has no defense to enforcement in the United States, leaving no risk of "duplication."

IBL counters (Br. 30) that, absent the sort of comparative analysis it failed to raise below, "the first [*Europcar*] factor always would weigh in favor of denying a stay" (emphasis omitted). But that argument cuts both ways: its comparative analysis would, by its account, always weigh in favor of a stay, contrary to *Europcar*'s admonition that "[a] stay of confirmation should not be lightly granted." 156 F.3d at 317. Moreover, the first *Europcar* factor—the purposes of arbitration— usually favors enforcement, as "the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards." *Id.* at 318; *see also, e.g.*, *MGM Productions*, 573 F. Supp. 2d at 778 ("Confirmation, not a stay, advances the general objective of expeditious resolution of disputes." (internal quotations and citation omitted)); *Science Applications*, 2017 WL 65821, at *2 ("[A]djournment of enforcement proceedings impedes the goals of arbitration…." (quotations and citation omitted)).

42

*Finally*, IBL has not shown that there would be "long, drawn-out …

proceeding[s]" (Br. 31) were it somehow to win the annulment action.  If IBL were

to prevail in its annulment action, it could simply move to vacate the district court's

judgment under Federal Rule of Civil Procedure 60(b)(5).  *See, e.g.*, *Thai-Lao*

*Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172,

176 (2d Cir. 2017).  The district court, having entered final judgment within three

months of service on IBL, would no doubt resolve such a motion quickly.  Only a

stay would threaten to yield long, drawn-out proceedings.

In sum, IBL has failed to show that the district court abused its discretion in

applying the first two *Europcar* factors, which are the most important.  *See* 156 F.3d

at 318 ("[T]he first and second factors on the list should weigh more heavily in the

district court's determination.").

### C.  IBL's Lebanese Action Appears To Have Been Brought Solely To Delay Enforcement (*Europcar* Factor 4)

The fourth *Europcar* factor considers "the characteristics of the foreign

proceedings including (i) whether they were brought to enforce an award (which

would tend to weigh in favor of a stay) or to set the award aside (which would tend

to weigh in favor of enforcement); (ii) whether they were initiated before the

underlying enforcement proceeding so as to raise concerns of international comity;

(iii) whether they were initiated by the party now seeking to enforce the award in

federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute." *Id.*

The district court reasonably concluded that "[t]he fourth factor also counsels against a delay in confirmation." SPA-19. The court observed that "IBL waited to commence its action to set aside the Award for roughly four months after the Award was issued and for almost two months after Iraq Telecom obtained executory effect for the Award from a Lebanese court," and that "the weakness of its arguments in the annulment action reinforce the impression that IBL is simply seeking to delay the inevitable confirmation." SPA-19-20.

IBL does not meaningfully challenge the district court's analysis.

*First*, IBL's Lebanese annulment action sought "to set the award aside (which would tend to weigh in favor of enforcement)" and against a stay. *Europcar*, 156 F.3d at 318. IBL does not dispute this point.

*Second*, IBL commenced its Lebanese annulment action after, not "before[,] the underlying enforcement proceeding," which further favors enforcement. *Id.* Again, this is undisputed. IBL claims (Br. 42) that it "moved to annul the award … well within the [thirty-day] statutory period for filing such an action." By that, it means it filed the day before its deadline hit. *See id.* (stating it filed on January 14, 2022, after receiving notice on December 16, 2021). Every party who seeks a stay pending annulment presumably acts within the maximum outer limit fixed by

statute—but that is quite different from acting promptly and in good faith, rather than in a tactical effort to delay and obstruct.

IBL responds (Br. 42-43) that it "filed the annulment action in Lebanon <u>before</u> it received notice of [Iraq Telecom]'s under-seal and *ex parte* efforts to enforce the award in the United States" (emphasis in original). But this is irrelevant: Because IBL undisputedly did not seek annulment until after it learned of Iraq Telecom's enforcement actions in Lebanon, its annulment action supports a reasonable inference that it was brought to delay enforcement. By contrast, Iraq Telecom also filed the U.S. action first (in December 2021), thereby acting more expeditiously than IBL in seeking to protect its rights. *See* JA-286. Finally, IBL did not even make this argument below, and thus forfeited it. *See* D. Ct. ECF 117 at 8-10.

*Third*, IBL wrongly claims (Br. 43) that the court should have considered that Iraq Telecom "itself initiated proceedings in Lebanon before filing this enforcement proceeding." This argument, too, was not made by IBL below. *See* D. Ct. ECF 117 at 8-10. In any event, the point is irrelevant. IBL is not seeking a stay pending resolution of Iraq Telecom's Lebanese enforcement action, which has long since concluded, but of its own opportunistic annulment action. And Iraq Telecom did not waive the right to enforce the Award in the United States merely because it sought simultaneous enforcement in Lebanon. Indeed, the New York Convention specifically "allow[s] concurrent enforcement … actions, as well as simultaneous

enforcement actions." *Compañía de Inversiones Mercantiles*, 970 F.3d at 1299 (quoting *Karaha Bodas*, 335 F.3d at 367).

*Finally*, IBL challenges (Br. 44) the district court's conclusion that IBL's arguments were so weak as to suggest it filed the annulment action merely for purposes of delay. As discussed above, however, IBL never challenged that conclusion below. *Supra* Section A. Moreover, IBL's subsequent conduct reinforces the finding that it filed the annulment action simply for purposes of delay. After the district court issued its opinion, IBL argued that the Second Arbitration should be stayed pending resolution of its annulment action, again without offering any defense of its (meritless) arguments. D. Ct. ECF 117 at 8-10. This only underscores the reality that IBL's annulment action is simply a tactical device for delaying payment and recompense to Iraq Telecom.

### D. The Balance Of Hardships Favored Enforcement (*Europcar* Factor 5)

The fifth *Europcar* factor is the "balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive 'suitable security' and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country." 156 F.3d at 318. *Europcar* emphasized that the "insolvency of one party may play [a] role in determining relative hardships." *Id.* (citing *Berg*, 61 F.3d at 105).

46

The district court irreproachably found that "[t]he balance of hardships also weighs against IBL's request" for a stay. SPA-20. "Iraq Telecom has acted diligently in the United States and Lebanon to enforce the Award," and "[b]ecause of Lebanese capital controls, it will have difficulty obtaining effective payment of the Award within Lebanon and must rely on the Convention's procedures for confirmation and enforcement outside Lebanon." *Id.* The court then cited its earlier finding that IBL had threatened to discharge its debt in Lebanon in devalued Lebanese Pounds, or in U.S. Dollars that Lebanese banks would refuse to "wire[] out of the country." JA-757. "If IBL" were to take these steps, "this would deprive Iraq Telecom of the full benefit of the Award." *Id.* "And because of IBL's precarious financial condition, there is a genuine question of whether IBL will honor its obligations under the Award." SPA-20. "IBL, on the other hand, has not identified any hardship that it will encounter." *Id.*

IBL again fails to identify any abuse of discretion in the district court's analysis. It does not dispute that immediate enforcement would not cause it any hardship. *See* Br. 44-48. Instead, IBL contends only that Iraq Telecom's interests were adequately secured, again largely on flawed bases it never raised below.

*First*, IBL asserts (Br. 46) that the court failed to take into account the attachment—as of now, $28 million—in place below. But IBL never raised this argument before the district court. *See Lamont*, 977 F.3d at 181 n.3. And the

argument is unpersuasive.  As this Court found, the existing attachment is needed for security for the pending Second Arbitration on damages, which will be "ineffectual without an attachment since IBL appears to be insolvent." *Iraq Telecom*, 43 F.3d at 271 n.2.  This Court has held that Iraq Telecom is likely to win a $97 million award against IBL in that Second Arbitration, "based on the district court's own findings that IBL and Barzani in concert defrauded Telecom of $97 million, and that Telecom was likely to establish joint and several liability as to IBL" in the Second Arbitration.  *Id.* at 276.  The existing $28 million attachment would cover less than a third of this likely $97 million (or more) award, even setting aside the First Arbitration Award.  But even the $28 million amount is at risk, for IBL is right now urging the district court to reduce the attachment to no more than $17 million, less than a fifth of its total liability.  *See* D. Ct. ECF 147 at 23.  Finally, this Court has found that IBL "admitted that it intends to dissipate the funds [currently] held in the correspondent accounts." *Iraq Telecom*, 43 F.3d at 271 n.2.  It is very clear, therefore, that the existing attachment does not provide adequate security for Iraq Telecom.

IBL's potential insolvency affords yet another reason why the attachment cannot be relied upon.  If IBL were to enter liquidation in Lebanon, the resulting bankruptcy proceedings could further complicate and compromise Iraq Telecom's ability to recover.  *See, e.g.*, *Hulley Enters. Ltd. v. Russian Fed'n*, 2022 WL 1102200,

at *5 (D.D.C. Apr. 4, 2022) (lifting Article VI stay due to "the evolving risk that Russian Federation assets in the United States may be liquidated or otherwise become inaccessible").

*Second*, IBL claims (Br. 46) that it "provided additional security … in the form of the 'tender and deposit' payment in Lebanon," but this only underscores IBL's bad faith. IBL did not make any "payment" to Iraq Telecom. As the district court found (and as established by an uncontradicted expert declaration), a Lebanese tender-and-deposit "is an offer to pay a debt," but it "discharges the debt" only "if the creditor accepts the payment or if, upon application by the debtor, a court renders a judgment that the [tender-and-deposit] was adequate performance on the debt." SPA-9; *see* JA-793. "[N]either of those things has occurred" here. JA-793. "Upon receiving notice of [IBL's] [tender-and-deposit offer] on March 23, Iraq Telecom recorded its refusal to accept the check on the notification slip and in a separate letter to IBL demanded payment by international bank transfer," as was its right. SPA-10. Nor did IBL "commence[] a judicial action to validate the tender and deposit" within ten days of Iraq Telecom's refusal, as required by Lebanese law to overcome the refusal. JA-794. Moreover, "banker's checks denominated in foreign currency cannot be readily liquidated into cash at face value by the recipient," SPA-9, and is not a "viable means of payment" under Lebanese law. JA-795.

49

Despite these undisputed facts, IBL repeatedly misrepresented to the court below that "IBL has already" "paid" the Award in Lebanon. D. Ct. ECF 117 at 11 ("[T]he Court should make clear that the costs awarded to IT in the Final Award may be paid in Lebanon—and, indeed, that *IBL has already done so*." (emphasis added)). IBL's misleading tender-and-deposit ploy only underscores Iraq Telecom's need for prompt enforcement in order to protect itself against IBL's cynical litigation tactics.[4]

*Third*, IBL asserts (Br. 46-47) that it "reinforced its willingness and ability to provide adequate security … by obtaining a supersedeas bond … pending this appeal," but, again, IBL did not make this argument below, and in fact this argument only underscores the need for enforcement. Below, Iraq Telecom repeatedly requested that the district court order IBL to post suitable security if it granted IBL's request to modify the attachment. *See* D. Ct. ECF 99 at 21-22. Unlike in the cases it cites (Br. 48), IBL here never took up Iraq Telecom's request or offered to post

---

[4] IBL's passing comment (Br. 12 n.4) that "other courts have held that a tender-and-deposit under Lebanese law extinguishes the underlying claim" is misleading at best. IBL does not dispute (and did not dispute below) that the tender-and-deposit procedure does not extinguish a claim, absent a court order, when the creditor refuses the offer. *Manoukian* is not to the contrary, but held that a tender-and-deposit does not satisfy a debt when a customer demands payment by "international transfer." *Manoukian, supra,* ¶ 130. Nor is it clear that *Khalifeh v. Blom Bank SAL* [2021] EWHC 3399 (QB), https://perma.cc/DC2P-FXPD, ruled that a *refused* tender-and-deposit can extinguish a debt. Finally, IBL does not challenge the bevy of Lebanon cases holding that a banker's check is no longer a valid form of payment. In sum, IBL lacked a valid basis for its statements below.

security until the court entered final judgment. *See Inversiones Samekh, Sociedad Anonima v. Hot Springs Inv. LLC*, 2011 WL 13221000, at \*5 (S.D. Fla. Feb. 7, 2011) (requiring the respondent "to deposit [a] sum of [money] or suitable bond into the Court Registry," not relying on attachment); *Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*, 2005 WL 947126, at \*5 (N.D. Ill. Apr. 12, 2005) (similar). IBL has posted security only in response to the court entering final judgment.

*Finally*, IBL argues (Br. 47) Iraq Telecom is adequately protected "through the Lebanese attachment order, which continues to attach all of IBL's property in Lebanon to secure the $3 million costs award," but that account elides key facts. It was undisputed below that, "in October 2019, Lebanon's banks imposed informal capital controls on financial outflows from Lebanon," such that "Lebanese banks do not permit" anyone to "transfer [USD] funds to overseas accounts." JA-308, 810-11. This means that "US dollar balances in accounts at Lebanese banks are stranded," "cannot be converted into actual cash," and "are currently worth only a fraction of face value." JA-795-96. That Iraq Telecom "initiated the Lebanese attachment proceedings" (Br. 47) is irrelevant given that Iraq Telecom was entitled to pursue enforcement in multiple forums. *Supra* Section C.

### E.   The Award Will Not Receive Any Greater Scrutiny In Lebanon (*Europcar* Factor 3)

The court below found that just one factor weighed in favor of a stay. Under *Europcar*, courts should consider "whether the award sought to be enforced will

51

receive greater scrutiny in the foreign proceedings under a less deferential standard of review." 156 F.3d at 317.

The district court concluded that this factor favored a stay, but "only slightly." SPA-20. The court assumed that, "[a]s the primary jurisdiction, a Lebanese court in an annulment action may be able to rely on a broader range of grounds to vacate the Award than the seven defenses contained in the Convention." *Id.* But "[e]ven on the assumption that a Lebanese court will have more leeway to vacate the Award, IBL has not shown that that additional authority will be of benefit to it" because "IBL has not shown that it is likely to succeed on either of the two grounds on which it relies in its annulment proceeding." SPA-20-21. IBL's only response (Br. 38)—that the court "did not analyze any of [IBL's annulment] grounds"—is demonstrably false. *Supra* Section A. The district court's discounting this *Europcar* factor was eminently reasonable. *See, e.g.*, *Stileks*, 985 F.3d at 880 (requiring a district court to consider only "the first and second [*Europcar*] factors," not this one).

If anything, the district court's ruling was generous to IBL, as "there is no indication that" a Lebanese court will actually "review the Award[] with a different level of scrutiny than" a U.S. court. *Baldwin*, 2022 WL 2340872, at *5. Absent such evidence, courts often find that this factor does not favor a stay.[5] IBL asserts

---

[5] *See, , e.g.*, *Compañía de Inversiones Mercantiles*, 2019 WL 8223562, at *14 ("In Bolivia, the court reviewing a request for annulment may set aside the arbitral award

(Br. 37) that, because the Award was issued in Lebanon, Lebanese courts are not limited to the New York Convention's limited grounds and "*may* apply their own domestic law when evaluating an attempt to annul" the Award (emphasis added) (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007)). But that does not mean Lebanese courts *would* apply greater scrutiny than a U.S. court.

In actuality, Lebanon will not apply any greater scrutiny to the Award than would a U.S. court. Lebanon is "an arbitration-friendly jurisdiction," its grounds for annulling awards "are limited," and "Lebanese courts tend to apply a high threshold for the annulment of such awards." JA-371 & n.2 (third quotations and citation omitted). Additionally, IBL's "international public" order challenge, JA-372, is not a local ground for annulment, but just the same the "public policy" defense that a U.S. court could consider under Article V(2)(b) of the New York Convention. *Compare* Gary B. Born, *International Commercial Arbitration* 3611-13 (3d ed.) (Jan. 2021) (international public order defense applies to "clear violations of fundamental, mandatory legal rules"), *and* Mayer & Sheppard, *supra*, at 255, *with Europcar*, 156 F.3d at 315 (the New York Convention's public policy defense is limited to awards

only on limited grounds … which do not appear to be much broader than those under Article V of the New York Convention" and "evince a conscious restriction on the available recourse against an arbitral award."); *Clientron*, 2014 WL 940406, at *5 (no "evidence concerning the standard under which the Taiwanese court will review the award").

violating "our most basic notions of morality and justice" (internal quotations and citation omitted)). IBL is thus invoking a defense in Lebanon that it could have raised but failed to raise below.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order denying IBL's request for a stay and entering final judgment.

Dated:  October 26, 2022   Respectfully submitted,

        QUINN EMANUEL URQUHART &
        SULLIVAN, LLP

        */s/ Derek L. Shaffer*

Kristin Tahler      Derek L. Shaffer
865 S. Figueroa St., 10th Floor  1300 I St. NW, Ste. 900
Los Angeles, CA 90017   Washington, DC 20005
Tel.: 213-443-3000    Tel.: 202-538-8000
Fax: 213-443-3100    Fax: 202-538-8100

        Kevin S. Reed
        William B. Adams
Alex H. Loomis     51 Madison Avenue, 22nd Floor
111 Huntington Ave, Ste. 520  New York, NY 10010
Boston, MA 02118    Tel.: 212-849-7000
Tel.: 617-712-7100    Fax: 212-849-7100
Fax: 617-712-7200

*Counsel for Petitioner-Appellee Iraq Telecom Limited*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and Local Rule 32.1, the undersigned counsel certifies that this document complies as follows:

This motion complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains <u>12,896</u> words excluding portions exempted by Fed. R. App. R. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: October 26, 2022

*/s/ Derek L. Shaffer*
Derek L. Shaffer
1300 I St. NW, Ste. 900
Washington, DC 20005
Tel.: 202-538-8000
Fax: 202-538-8100

## CERTIFICATE OF SERVICE

I hereby certify that, on October 26, 2022, the foregoing document was served on all parties or their counsel of record via CM/ECF.

Dated: October 26, 2022        */s/ Derek L. Shaffer*
                                      Derek L. Shaffer
                                      1300 I St. NW, Ste. 900
                                      Washington, DC 20005
                                      Tel.: 202-538-8000
                                        Fax: 202-538-8100